15429

THOMPSON v. FORD MOTOR COMPANY

(21 S. E. (2d), 34)

July, 1941.

*Mr. W. B. Martin,* of Orangeburg, Counsel for Appellant,

*Messrs. Cansler & Cansler,* of Charlotte, N. C., and *Messrs. Robinson & Robinson,* of Columbia, Counsel for Respondent,

June 15, 1942.

The Opinion of the Court was delivered by Mr. Chief Justice Bonham:

Two issues present themselves for determination in this case:

(1) Was the respondent doing business in this State in the sense required to subject it to the jurisdiction of the Courts thereof, at the time this cause of action arose, and at the time of the commencement of the action; and

(2) Was service made on its agent so as to support a personal judgment against it.

These two questions are so interrelated, and are so intermingled in their discussion by some of the authorities which will be cited herein, that to some extent they will be treated together.

The action was instituted on May 9, 1941, by the service of a summons without a complaint, by delivering a copy of the summons to C. E. McAlister, an employee of the respondent, while he was in the Town of Branchville, South Carolina. In due time the respondent, a foreign corporation, served upon appellant's counsel a notice of a motion, seeking an order setting aside the service, and at the same time served upon appellant's counsel certain affidavits and a copy of a contract, dated December 22, 1938, between the respondent and D. W. Gavin & Co., Inc. In reply thereto, the appellant served his affidavit upon opposing counsel. Upon the affidavits and the exhibits attached thereto, the motion was heard and granted by the Honorable M. M. Mann, pre-

siding Judge, who filed an order, dated July 3, 1941, in which he set aside the service upon the respondent upon the grounds that C. E. McAlister was not an agent of the respondent upon whom process could be served, and that the respondent was not doing business in South Carolina, so as to subject it to the jurisdiction of the Courts of this State. The case comes to this Court upon appellant's exceptions to the order of Judge Mann.

From the affidavits submitted by the respondent, it appears that it is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at Dearborn, Michigan, that it maintains a branch office, and has a branch manager, at Charlotte, North Carolina, which latter office has jurisdiction over the sale of its products to dealers in South Carolina, that the contract referred to herein with D. W. Gavin & Co., Inc. (one of the original defendants in this action), was executed by an officer of D. W. Gavin & Co., Inc., at Charlotte, North Carolina, and that it was executed by the respondent at its principal place of business and that it was subsequently returned to respondent's branch office at Charlotte, North Carolina, through which branch all of respondent's agreements with dealers in this State are made. It further appeared from the respondent's affidavits that C. E. McAlister is an employee of the respondent under the direction of the Charlotte, North Carolina, branch thereof.

With reference to the duties of his employment with the respondent, this affiant said that he visits those who deal in the respondent's products for the purpose of encouraging the sale of parts and accessories, of assisting dealers in training their mechanics, and, when requested by the dealers, by reason of his technical knowledge of, and familiarity with cars and trucks manufactured by the respondent, to assist the mechanics of the dealers in ascertaining the cause of mechanical troubles in cars or trucks complained of by customers of the dealers, and advising such mechanics how to correct such troubles. The affiant admitted the delivery to

him of a copy of the summons in this case while he was at Branchville, South Carolina, but made no specific reference to his duties in connection with his sojourn at that place. The other affidavits of the respondent likewise made scant reference to the purpose of Mr. McAlister's trip on this particular occasion. The affidavit of J. J. Donavan, branch manager of respondent's branch at Charlotte, North Carolina, also stated that C. E. McAlister was at Branchville, South Carolina, on May 9, 1941, and that a copy of the summons was there delivered to him, but was silent as to further specific facts relating to Mr. McAlister's exact duties in Branchville.

The affidavit of the appellant alleged that he purchased a Ford truck from D. W. Gavin & Co., which advertised with advertisement furnished by the respondent, that D. W. Gavin & Co. was a duly authorized Ford dealer, that appellant had no notice of any limited relations existing between respondent and D. W. Gavin & Co., and that he paid the respondent's listed price therefor, under a warranty, not from D. W. Gavin & Co., but from respondent, that the said truck was of good workmanship, in sound condition, and that the respondent would, within a period of ninety days, and before the truck had been driven four thousand miles, repair defects which may appear and develop therein; that immediately, and within said period and mileage, the motor in the truck proved to be seriously defective in a manner which affiant alleged; that appellant immediately notified respondent's said dealer at St. George, South Carolina, and that the dealer attempted and failed to rectify the trouble.

The affiant further deposed that on March 26, 1941, he wrote respondent of the truck's defective condition, and that respondent replied, stating that "we note that your truck was purchased through our dealer at St. George, S. C.," and suggesting that appellant return the truck to the said dealer in order that the dealer might be in a position to check the unit completely and be in a position to advise ap-

pellant what should be done. Thereupon appellant again, in pursuance of the terms of this letter, a copy of which respondent had sent to the dealer, took the truck to the dealer, who a second time failed to rectify or find the trouble or defect therein. Deposing further, appellant stated that a few days prior to May 9, 1941, in pursuance of the said letter, one C. E. McAlister telephoned him to the effect that respondent had sent him as its agent and representative in the place of a Mr. F. D. Russell, to contact appellant regarding the defective truck, and requested appellant to send it to the dealer's place of business. This was done, and pursuant to the said letter C. E. McAlister examined the motor in the truck, but failed to locate the cause of the trouble, and therefore was unable to repair it, and that subsequently C. E. McAlister was served with the summons herein, whereupon C. E. McAlister transmitted the summons to his principal and employer, the respondent.

Attached to appellant's affidavit was the letter which has been referred to, marked Exhibit "A", together with a second letter, marked Exhibit "B", from respondent to appellant, dated May 5, 1941, in which respondent stated : "We are asking our representative, Mr. F. D. Russell to contact you in the very near future regarding this matter" with further reference to the Ford truck. In connection with the contents of this letter appellant had deposed that respondent had sent C. E. McAlister in the place of F. D. Russell.

The contract between respondent and D. W. Gavin & Company is a long, highly complex, and ingenious instrument, the copy of which, in the Transcript of Record, fills seventeen printed pages. It is an inescapable conclusion from the affidavits filed by the respondent that the contract was prepared by, and phrased by, the respondent. Two of such affidavits, one by the manager of respondent's branch at Charlotte, North Carolina, and one by the chief clerk of that office, refer to the present contract as being similar to the standard form of sales agreement between respondent .

and its dealers. Such standard forms could scarcely have been prepared by any one except the respondent.

The contract in the present case contains many interesting provisions. It provides that the company agrees to sell, and the dealer agrees to purchase for resale, Ford passenger automobiles, commercial automobiles, trucks, accessories and other things, upon certain conditions, "subject to the right reserved by Company to sell to other dealers and direct to retail purchasers in the United States without obligation of any kind to Dealer on any such sale." It provides that the "Company will sell its products to Dealer at such prices as are from time to time established by Company plus Company's charge for distribution and delivery" together with a provision for reimbursing the company for certain tax payments.

It is provided that "title to all Company products, except in a case where the invoice shows sale to be on credit, shall be and remain with Company until actual receipt of the full purchase price in cash by Company." With reference to checks and other negotiable paper from the dealer, the agreement provides: "Unless Company has received cash in full payment of any such check, draft or other commercial paper, its right to retake and resell Company products for which such paper is issued shall continue." It is provided that the prices of all company products shall be subject to change from time to time, that the dealer agrees to maintain a place of business "and only one place of business" (subject to one or two exceptions) and that such place of business shall be "located in a place and equipped in a manner acceptable to Company; to display conspicuously thereon approved Ford signs; to install and maintain therein the tools, machinery and equipment recommended by Company; to employ sufficient, competent salesmen to solicit adequately all potential purchasers of Company products in the community in which Dealer is located, and sufficient service mechanics to render prompt, efficient serv-

ice to owners of Company products and to render such service to any owners of Company products engaging such service." It further provides that the dealer is "to install and maintain an accounting system in accordance with Ford Dealers Accounting Procedure Manual as approved by Company; to furnish Company at regular intervals as designated by Company accurate financial statements reflecting the true financial condition of Dealer's business on standard forms provided by Company for that purpose; to allow representatives of Company, at all reasonable times and from time to time, to examine all records, contracts and accounts covering sales or service of Company products by Dealer and to examine Dealer's stock and place of business and to test Dealer's equipment and facilities," and "to submit promptly to Company, Dealer's Ten Day Reports accurately and fully prepared on forms provided by Company therefor and on the dates specified therein." The dealer further agrees not to use the words "Ford," "Fordson," "Lincoln," "Zephyr," "Mercury," or any trademark name adopted by the company, or coined words or combination containing the same, in connection with any business conducted by him other than in dealing in company products, and not to contest the validity of any patent used or claimed by the company, nor to contest the right of the company to exclusive use of any trademark or trade-name at any time adopted by the company. The dealer agrees to refer purchasers to the "Ford Motor Company Warranty" printed on the back of the retail buyer's order form supplied by the company, and "to maintain a stock of passenger automobiles, commercial automobiles and trucks of current model equivalent to between eight and twelve per cent. (8% and 12%) of dealer's retail deliveries of such units during preceding twelve (12) months" with certain variations therefrom and "to maintain a stock of genuine Ford parts and approved accessories of an assortment reasonably comparable to the current demand" in certain specified propositions. In case the dealer has not been

operating under a Ford Sales Agreement during the twelve months prior to the agreement, the dealer agrees to maintain at all times a stock of new Ford passenger automobiles, commercial automobiles and trucks equivalent to the estimated sales during the next thirty days, together with parts and accessories in a certain estimated amount.

The dealer agrees to furnish the company, prior to the tenth day of each month, with an order for the estimated number of automobiles and trucks which dealer will need for sale and to maintain his stock during the succeeding month, and will, on dates designated by the company, furnish the company with orders on forms provided by the company for dealer's estimated requirements for parts and accessories, but the company reserves the right to follow or to depart from such orders, "and Company shall in no way be liable for failure to ship, or for delay in shipments however caused." The dealer agrees to have available at all times in good running order and presentable condition for demonstration purposes, an adequate number of Ford units of current model. Insofar as it is lawful for dealer to do so, he agrees "not to resell Company products bearing Company's trade-mark or trade name at less than retail prices established for Dealer's city or town from time to time by company, except in cases where such goods have been damaged, or have become obsolete, or are about to become obsolete or change in models, or in the case of sales to Company or its nominees, or to other authorized Ford Dealers" subject to one or two other exceptions. The dealer agrees, if requested by the company, to display prominently in his showroom a chart showing current "retail pieces as established by Company" for dealer's city or town.

Then follow certain restrictions upon the dealer with reference to sales made beyond his territory. In certain instances the company acts as umpire between dealers, but does not guarantee the results. Then follow certain restrictions as to the sale of parts for Ford automobiles and trucks,

except "genuine Ford" parts. The dealer agrees not to use sales policies or advertising matter in any manner in connection with his business as a Ford dealer which are detrimental to the company or to other Ford dealers, or to which the company may object as being detrimental to its good will. The dealer agrees to "accept down payments of cash or used automobiles in anticipation of future deliveries of passenger automobiles, commercial automobiles, or trucks, only in trust, and to keep all such cash in a separate earmarked fund not commingled with dealer's own funds, and to hold title to such used automobile only in trust until the transaction for the new passenger automobile, commercial automobile, or truck is consummated and not to place any lien thereon, or to sell the same without at the time placing the amount of the trade-in allowance of such used automobile in such earmarked trust fund in lieu of said used automobile in trust. * * * Dealer agrees to enter into an agreement with such prospective customers at the time such payment or transfer of title of property is made binding Dealer to hold such monies or property in trust as provided above."

In case of termination of the agreement by the company, it is agreed that no prior notice of termination need be given in the event of dealer's failure to keep his place of business open during the hours customary in the trade, or in case of an assignment or attempted assignment of interest by the dealer. In the event of the termination of the agreement by either party, the company shall have the right and option at its election to repurchase any new and unused passenger automobile, commercial automobile or trucks in dealer's possession at the time of termination, upon terms specified in the agreement. Upon the termination of the agreement, certain parts and accessories are to be sold to the company by the dealer, and "Dealer also agrees to carefully pack and box at dealer's own expense and ship to Company" all parts and accessories which the company purchases under the

terms of this provision. In case the dealer fails to box and ship such goods, the company may do so and. deduct such expense from the purchase price. In the event of termination by either party, the company may, at its option, examine the stock of the dealer and select any such genuine parts and approved accessories that dealer may then have, and the company shall have the right and option to repurchase them upon specified terms. It is further provided that the agreement may not be assigned by the dealer without the written assent of the company, executed by one of its authorized officers.

The contract contains many other provisions retaining and strengthening the vast control which respondent had the right to exercise over the conduct and affairs of D. W. Gavin & Co., Inc., but enough examples have been given herein to illustrate the authority which respondent exercised over this "dealer".

Upon the pleadings, affidavits and exhibits before him, all of which have been referred to herein, and upon the law and authorities which he conceived to be applicable thereto, Judge Mann has written a scholarly order which, except for certain distinctions between the present case and the authorities upon which he founds his conclusions, and except for certain misapprehensions and misconceptions of the law and of the controlling authorities, would be a convincing decree. Furthermore, in holding that the "mere unsupported allegation in the plaintiff's affidavit cannot prevail against the facts as established by the detailed affidavits submitted by the. defendant," it is patent that Judge Mann misconstrued the legal effect of the contract between respondent and D. W. Gavin & Co., Inc., and that he misapplied to it the authorities which he cites. Although the appellant's affidavit was outnumbered by the three detailed affidavits by which the respondent sought to deny that it was amenable to process in this action, the respondent's own contract, which was intended to be performed in South Carolina, and which the respondent itself offered in evidence, and whose provisions

were obviously perpared by it, all of which should be kept in mind when its legal effect is construed, speaks even more eloquently than all the other affidavits combined, although the three affidavits of the respondent loudly proclaim that there was not, and could not have been, any service on it in this case.

Judge Mann has cited the fact that the agreement itself provides that it is a Michigan contract, and that it definitely states that the "dealer" is not an agent of the respondent. He further points out that one of the methods by which deliveries are made under this contract is for the dealer to drive from this State to Charlotte, North Carolina, where delivery is made, whereupon the dealer brings it across the State line into South Carolina. It is also true that the contract provides that it is "executed as a Michigan agreement and construed in accordance with the laws of the State of Michigan." Similarly, it is true that the respondent, a Delaware corporation, wished this contract, which was to be performed in South Carolina, to be executed by the dealer in North Carolina under the laws of Michigan. Many other provisions in the contract could be cited revealing the means by which respondent has astutely sought to secure the protection and the benefits of the laws of South Carolina while escaping any liability thereunder. The entire contract is replete with the most ingenious devices for acquiring the unequal protection of the laws of this State, and not the mere equal protection to which respondent is entitled under the Fourteenth Amendment to the Constitution of the United States.

In the face of the respondent's own provision in its own contract that "title to all Company products, except in a case where the invoice shows sale to be on credit, shall be and remain with Company until actual receipt of the full purchase price in cash by Company," Judge Mann has found that respondent owns no property in this State. Such holding is also in the face of the provision of the contract, made a part of the record in this case by the respondent itself, that

"until Company has received cash in full payment of any such check, draft or other commercial paper, its right to retake and resell Company products for which such paper is issued shall continue." Furthermore, the dealer agrees, under the contract to accept down payments of cash or used automobiles only in trust, and to keep such cash in a separate earmarked fund not commingled with the dealer's funds, and to hold title to such used automobile in trust until the transaction for the new automobile is consummated. Such funds and such used automobiles, under the contract, are held by the dealer in trust for the respondent. In the same contract respondent reserved various property rights with reference to the disposition to be made of company products upon the termination of the contract. If each of these provisions in the contract does not prove, by respondent's own admission, that it does have property in this State, it certainly reveals the exercise of clever artifices and ruses for obscuring such property rights as it may hold.

Judge Mann has found that respondent is not doing business in South Carolina so as to subject it to jurisdiction here. Here, again, it is evident that he has misapprehended the legal effect of the facts upon which he bases his conclusion. The respondent contracted with D. W. Gavin & Company, Inc., for the establishment and maintenance of a place of business for the sale and repair of Ford automobiles, commercial automobiles and trucks, and for the sale of respondent's "genuine" parts, at St. George, South Carolina, and it appears from respondent's affidavits that this contract was performed and entered into by the parties as contemplated by the agreement. The contract as a whole, together with numerous specific provisions, a few of which will be mentioned here, warrants the inescapable conclusion that respondent was doing business in this State at the times involved in this case.

In the contract, the respondent reserved the right to sell to other dealers and direct to retail purchasers. For the respondent's products, the dealer is to pay such prices as are

from time to time established by respondent. The prices of all company products are subject to change from time to time. The dealer agrees to maintain a place of business, and only one place of business, subject to certain exceptions, and that such place of business shall be located in a place and equipped in a manner acceptable to respondent. The dealer agrees to display respondent's signs, to install and maintain tools, machinery and equipment which it recommends, to employ a sufficient number of salesmen, to employ efficient service mechanics, to render certain service to owners of respondent's products, to install and maintain the kind of accounting system approved by respondent, to furnish financial reports, to allow respondent access to dealer's records and accounts, and to his stock and place of business, to allow respondent to test his equipment and facilities, and the dealer agrees to make frequent reports to respondent, and not to do certain acts detrimental to the business of respondent, and to refrain in certain respects from infringing upon the business of other dealers. Under the contract the dealer is required to keep on hand a cetain stock of the respondent's products and to make orders in a certain manner and at a certain time, but the respondent reserves the right to follow or to depart from such orders and absolves itself from liability for failure to supply dealer's orders. The dealer agrees to keep on hand a sufficient number of respondent's automobiles for demonstration purposes. Furthermore, specific controls are established under the contract whereby respondent, and not the dealer, establishes the prices which the customer is to pay to the dealer for respondent's products, except under certain specified exceptions. The dealer cannot engage in sales policies (a very broad term) which are detrimental to respondent or to its dealers. Similarly extensive rights as to the disposition to be made of its products upon the termination of the contract are also retained by respondent. The rights which have been retained are broad, and the scope of such studied words as "detrimental" is almost boundless. Under this contract the respondent is able to control the

price which the dealer pays, and which he receives. Such of the dealer's acts as are not strictly regulated, are modified and governed by the respondent. In prohibiting the dealer from using sales policies in any manner in connection with his business as respondent's dealer which are detrimental to respondent, or to respondent's dealers, or to the public, or to which respondent might object as being detrimental to its good name or good will, respondent has, by such expansive terms, retained as much control over the dealer in this case, as it could expect to exercise over an admitted employee, in such respects.

When the plaintiff purchased the truck which was manufactured by the respondent, he also received, in this State, the warranty, not of D. W. Gavin & Company, Inc., but of the respondent. The present action is based upon a breach of that warranty, the breach having occurred, if at all, in this State. When plaintiff, acting under this warranty, complained to the respondent of a defect in the truck, which had been delivered to him in this State, respondent, by its letter of April 1, 1941, directed plaintiff to D. W. Gavin & Company, Inc., as the parties to whom the truck should be taken in this connection, stating that "we note that your truck was purchased through our dealer at St. George, S. C." Respondent also sent the dealer a copy of this letter "in order that they will be in a position to completely check this unit." Later, respondent wrote plaintiff again with further reference to the matter, stating that its representative, Mr. F. D. Russell, was by them being asked to contact plaintiff in the near future. In the plaintiff's affidavit, which is a part of the record in this case, it is stated: "That a few days prior to May 9th, 1941, in pursuance to said letter, one C. E. McAlister 'phoned plaintiff over long distance, stating that the Ford Motor Company had sent him as their agent and representative in the place of Mr. F. D. Russell to contact plaintiff regarding said defects." Mr. Russell was admittedly the representative of respondent, and Mr. Mc-

Alister was admittedly respondent's employee, having certain duties in connection with respondent's dealers. If Mr. McAlister, as the record indicates, was sent in the place of Mr. Russell, Mr. McAlister can hardly be considered in any other light than as the representative of respondent in the transaction of its business in this State, having been sent into South Carolina by the respondent in relation to the specific matter in dispute between the parties, under respondent's warranty. All of the foregoing acts of the respondent in connection with the effort by plaintiff to obtain satisfaction for the defect or defects in his truck, strongly indicate that the respondent was doing business in South Carolina in relation to this very transaction.

Judge Mann has cited decisions from other states which he deems to be authority for the proposition that respondent was not doing business in South Carolina. Here, again, he misapprehends the law governing this case. The question is not whether respondent or manufacturers of other automobiles were doing business in Oklahoma, Pennsylvania or Oregon under the facts that existed in those cases, and at such times as were involved therein, but whether the respondent was doing business in this State under the facts involved in the case at bar, and at the times named in this litigation. A person, not doing business at one particular time in a certain state, is quite frequently so engaged at other times, and this is true regardless of whether that person intends that the legal effects of his acts be to constitute the doing of business or not. Even if this respondent was not doing business at the times and places and under the circumstances involved in other litigation, this still does not dispose of the question of whether respondent did business and had an agent upon whom legal service could be made at the time and place and under the circumstances now before us. The present question is whether the facts in this case rendered the respondent legally liable to the service which was made.

Judge Mann has also pointed out that a distinction exists between an isolated transaction which "does not constitute doing business," and a regular course of business within a state which does constitute doing business in a jurisdictional sense. Certainly the respondent's business in this State was not an isolated transaction which Judge Mann seems to have had in mind. Under the affidavits offered by the respondent itself, it appears that it has done business with D. W. Gavin & Company, Inc., under this same contract, since December, 1938. Also, by the same affidavits, it appears that, since October 1, 1934, all business that respondent transacts with its dealers in South Carolina is done under similar contracts. This is its standard practice, its normal course of conduct, and this was its method of doing business with the dealer in the present case, D. W. Gavin & Company, Inc., which was subject to such control that even the hours during which it must do business were fixed by the agreement. The agreement even goes so far as to provide that no prior notice of termination of the agreement by the respondent need be given in the event of the dealer's failure to keep his place of business open during certain hours. No isolated instance was contemplated when the respondent entered into such a specific, detailed contract, designed to cover all the vicissitudes it could think of as likely to arise over a long period of time.

On each page of the contract appears further evidence of respondent's complicated contractual artifice designed to obtain the benefits of doing business in this State while avoiding its legal consequences. Such flagrant evasion is the equivalent of a direct breach of the law.

Under the foregoing facts, it is obvious that respondent actually participated in the sale, at St. George, South Carolina, of the truck which it had manufactured, and which it had warranted to the plaintiff, for a valuable consideration, to be of good workmanship and sound, plaintiff having paid respondent's listed price therefor to the dealer which the

record fails to show sold any products other than those of the respondent.

In the order of Judge Mann, and in the brief of respondent, are cited certain .decisions from this State in support of the proposition that respondent was not doing business in this State in such a manner as to subject it to the jurisdiction of the Court in this case. An analysis of these cited decisions will reveal that in each instance the facts, and therefore the conclusions deducible therefrom, are distinguishable from those involved in the case at bar. The case of *Zeigler v. Puritan Mills,* 188 S. C., 367, 199 S. E., 420, was based mainly upon a situation in which the foreign corporation had no place of doing business within the State, had no property therein, and the only person representing the corporation who came within the State came for the purpose of soliciting orders. It was there held that the mere solicitation of business within a state is not sufficient to subject a foreign corporation to legal jurisdiction of the State's Courts. In that case the only authority of Mr. Averitt, upon whom the attempted service was made, was to solicit orders for Puritan Mills. In the present case, Mr. McAlister had the admitted duties of visiting persons, firms or corporations dealing in respondent's products for the purpose of encouraging the sale of parts and accessories, of assisting. dealers in training their mechanics and under certain conditions to assist dealers' mechanics in ascertaining the cause of mechanical troubles in cars or trucks complained of by dealers' customers, and advising dealers' mechanics as to how to correct such troubles. As we have seen, he was sent into this State by this respondent upon the business of respondent involved in this litigation and under the warranty given to this plaintiff covering the purchase of this particular truck. Further, as we have seen, under the contract between respondent and the dealer in this case, respondent had, for practical purposes, absolute control over the business of D. W. Gavin & Company, Inc., at St. George, South Carolina.

Respondent could regulate the time and place of the dealer's operations, and could exercise control over the prices which the dealer could charge for respondent's products. All of these facts add up to a very different situation from the one existing in the *Puritan Mills case*.

The order of Judge Mann also relies strongly upon the case of *State of South Carolina v. W. T. Rawleigh Company*, 172 S. C., 415, 174 S. E., 385, which held that W. T. Rawleigh Company was not doing business in this State, and that its dealer was not, therefore, an agent upon whom process could be served. An examination of that case readily shows that the contract there involved was very different from the contract between the dealer and the respondent in the present case. In the *Rawleigh case*, all goods shipped and delivered to dealers or customers became their sole property, the company retaining no right or interest therein. In that case the company sent the dealer certain sales helps which the dealer was at liberty to use or not as he saw fit. All communications between the company and the dealer were carried on through the mails. There was no admitted representative or employee in the State, and no person, admittedly an employee, in the State sent by the defendant in connection with the particular litigation involved or having regular duties within the State. In the *Rawleigh case*, the company gave no orders or directions to its dealers. In that case this Court said with reference to the W. T. Rawleigh Company, that it has had in the State no representatives or traveling salesmen to solicit orders. On page 425 of 172 S. C., 174 S. E., on page 390 of that decision this Court said:

"  *  *  *   B. C. Bryan and R. A. Shell sold its products in this state, and all the goods and products of the defendant which they sold were ordered by them through the mail *  *  *.   The plain interpretation of the contract is that *  *  *   the buyer becomes the sole owner of the goods purchased, and was at liberty to sell and dispose of the same

on such terms, conditions and at such prices as he may see fit. The dealer may or may not use the literature and other advertising matter furnished by the seller, and it is plainly provided that he is under no obligation to follow the seller's advice or suggestions to promote his business, and is not under any legal obligation to furnish the seller weekly reports of the progress of his business,  *   *   *."

Since the dealer in that case obviously was not the agent of W. T. Rawleigh Company, under the facts which scarcely resemble those in the present case, the defendant there could not be bound by the attempted service on the dealer. In the present case not only is there vastly more evidence that the respondent is doing business in this State, but the case differs further in that it was not the dealer upon whom service was made in the instant case, but upon an admitted employee of the respondent. Quoting further from the *Rawleigh case,* this Court said at page 428 of 172 S. C., at page 391 of 174 S. E.:

"An agent is one appointed by a principal as his representative and to whom the principal confides the management of some business to be transacted in the principal's name, or on his account, and who brings about or effects legal relationships between the principal and third parties. 21 R. C. L., 817."

In the duties of this respondent's employee, C. E. McAlister, both in general and with particular respect to this transaction, there existed a degree of agency beyond that of the dealer in the *Rawleigh case.*

Judge Mann also cites the case of *Wiggins & Sons, Inc., v. Ford Motor Company,* 181 S. C., 171, 186 S. E., 272, a case in which the action was instituted in April, 1932. The contract between the parties in that case is not set forth in full in the decision, but in view of the fact that the action in that case was instituted in April, 1932, and in view of the fact that in the present case the affidavit of H. R. Yoos, chief clerk of respondent's branch at Char-

lotte, North Carolina, contained the following statement: "that since October 1, 1934, all agreements between Ford Motor Company and Dealer in the State of South Carolina have been made through the Charlotte Branch of said Company upon the standard form of Sale Agreement of Ford Motor Company similar to the Sales Agreement with D. W. Gavin & Company, Inc.," it would appear that the contract in the present case is not the same as the one which was in issue in the *Wiggins case*. Furthermore, the *Wiggins case*, 181 S. C., on page 174, 186 S. E., on page 274, held that: "In determining what constitutes doing business, the courts have laid down no hard and fast rule, but are inclined to judge each case upon its own merits." The *Wiggins case* also makes mention of the case of *La Porte Heinekamp Motor Company v. Ford Motor Company*, 24 F. (2d), 861, in which the District Court in that state held that the Ford Motor Company was doing business in Maryland. Under the facts which existed in the *Wiggins case*, under the cause of action which arose in 1932, this Court held that the facts did not justify the application of the rule laid down in the Maryland case. However, in the case at bar, the facts are more nearly related to those of the Maryland case than to those of the *Wiggins case*. In the *Wiggins case*, attempted service was made upon a commercial traveler who had no connection with the litigation, and who had not been sent into the state by his principal upon the business that existed between the plaintiff and the defendant. As has been previously pointed out, Mr. McAlister was sent into this State by his employer for a specific purpose which did not exist in any of the cases which Judge Mann has cited. Although this respondent was held not to be doing business in this State under the facts which existed in 1932, in the *Wiggins case*, this cannot control or decide the question of whether it was so engaged under an entirely different state of facts in the year 1941.

In the case of *Ideal Theatre v. Southern Enterprises, Inc.,* 132 S. C., 352, 128 S. E., 166, it was held that evidence showing a non-resident corporation's control through stock ownership of a resident corporation operating a theatre, and the manner in which business was conducted at the theatre in this State, was sufficient to sustain the finding that the foreign corporation was doing business in South Carolina, and that the manager of the local theatre was the agent of the foreign corporation, service on the manager being binding upon the non-resident corporation.

In the case of *Richardson v. Frigidaire Corporation et al.,* 168 S. C., 473, 167 S. E., 681, the defendant, as in the present case, appeared for the sole purpose of objecting to the jurisdiction of the Court. This Court affirmed the order of the trial Judge, and directed that it be reported. In that order it is stated:

"It appears that Frigidaire Corporation by its officers gave notice to the Secretary of State of South Carolina of its desire to withdraw from the State in 1929, and it appears from the affidavit of one of the officers of said corporation that said corporation is not doing business in the State, but notwithstanding these there remains the question, has this corporation done any act which would show that it is actually doing business in the State at the time of the service of this complaint so as to give this Court jurisdiction of it.

\* \* \*

"From the evidence before me it would appear that the defendant is actually engaged in business in this State, and that J. R. Little is acting as its agent. It may be true that the defendant expressed its desire in writing to withdraw from the State, but the acts and expressions of the defendant at other times since it expressed its desire, and at such times as such acts and expressions were unguarded, must be given consideration in deciding this issue."

Although the facts in the *Richardson case* are not identical with those in the instant case, they are strikingly similar

in many respects, and the holding of this Court in that case that the defendant foreign corporation was doing business in this State, despite its protestations to the contrary, and that the person who attempted to adjust the difficulty between the parties was the agent of the defendant in a sense sufficient to perfect service upon it by serving him, has weight in determining the present case.

In the case of *McNeill et al. v. Electric Storage Battery Company et al.,* 109 S. C., 326, 96 S. E., 134, this Court was confronted with precisely the same two issues as are presented in the present instance. The contract in that case was closely related to the agreement in the present case, the principal difference being that in that case the contract definitely provided, instead of implying, that the dealer could sell no competing products. In holding that the foreign corporation was doing business in this State, and that its local sellers were its agents, this Court said at page 330 of 109 S. C., at page 135 of 96 S. E.:

"It will be seen that the appellant had absolute control of the Columbia business. It could fix the price from time to time without any reference to the price paid by its so-called purchaser; the codefendant could sell no other batteries; the purchaser so called must maintain a repair shop satisfactory to the appellant. It must promote, in every reasonable way, the interest of the appellant within and without its territory. It is true the contract provided that the relation of principal and agent should not exist, but when the provisions of a contract make a contract of agency then it is a contract of agency, and it makes no difference by what names the parties may call themselves. This contract gives the appellant complete control for the sale of its goods, and the business is the business of the appellant."

On page 329 of 109 S. C., 96 S. E., on page 134 of that case the Court said: "The appellant made a motion * * * to set aside the service of the summons on the ground that the appellant was not doing business in this state and its

codefendants were not its agents. The contract between the appellant and its codefendants must determine the question."

In that case, however, service was made on the dealers, and therefore that case has a bearing on the present case only insofar as the question of doing business in the State is concerned.

It has often been held by this Court that in determining whether a foreign corporation is doing business within a State to such an extent as to make it amenable to state jurisdiction, the federal authorities are controlling, because of the question of "due process," "equal protection," and "interstate commerce." *Wiggins & Son, Inc., v. Ford Motor Company, supra,* and *Zeigler v. Puritan Mills, supra.* Therefore it would. be well to examine some decisions on this issue in cases which have been determined by the Supreme Court of the United States.

In the case of *International Harvester Company of America v. Commonwealth of Kentucky,* 234 U. S., 579, 34 S. Ct., 944, 945, 58 L. Ed., 1479, it was held that: "For some purposes a corporation is deemed to be a resident of the state of its creation; but when a corporation of one state goes into another, in order to be regarded as within the latter it must be there by its agents authorized to transact its business in that state. The mere presence of an agent upon personal affairs does not carry the corporation into the foreign state. It has been frequently held by this Court, and it can no longer be doubted, that it is essential to the rendition of a personal judgment that the corporation be 'doing business' within the state. *St. Louis Southwestern R. Co. v. Alexander,* 227 U. S., 218, 226, 33 S. Ct., 245, 57 L. Ed., 486, 488 * * *. As was said in that case, each case must depend upon its own facts, and their consideration must show that this essential requirement of jurisdiction has been complied with, and that the corporation is actually doing business within the state."

In the above case it was held that the continuous solicitation of orders through the local agents of a non-resident manufacturing corporation, which are sent to another state to be filled, the articles ordered being delivered within the state, and the agents having authority to receive payment in money, check or draft, and to take notes payable at banks in the state, amounts to the doing of business in the state to the extent which will authorize the service of process upon its agents thus engaged.

In the case of *People's Tobacco Company v. American Tobacco Company*, 246 U. S., 79, 38 S. Ct., 233, 62 L. Ed., 587, Ann Cas., 1918-C, 537, it was held that in order to subject a foreign corporation to service of process in a State, the business done by it therein must be of such a nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction. In the present case, under the facts which have been discussed herein, such an inference is too clear and strong to be doubted. See, also, the case of *Western Electric Supply Company v. Abbeville Electric Light, etc., Company*, 197 U. S., 299, 25 S. Ct., 481, 49 L. Ed., 765.

A further example of the Federal rule that the determination of each case is governed by the particular facts therein, is the case of *St. Louis Southwestern Railway Company of Texas v. Alexander*, 227 U. S., 218, 33 S. Ct., 245, 248, 57 L. Ed., 486, in which it was held that a foreign railway company is doing business within the State, so far as the question of its amenability to service of process there is concerned, where its local representative undertakes to act for and represent it, negotiating for it, and in its behalf declining to adjust a claim made against it. Near the close of that decision it is said:

" * * * Here, then, was an authorized agent attending to this and presumably other matters of a kindred character, undertaking to act for and represent the company, negotiating for it, and in its behalf declining to adjust the

claim made against it. In this situation we think this was the transaction of business in behalf of the company by its authorized agent in such manner as to bring it within the district of New York, in which it was sued, and to make it subject to the service of process there."

Similarly, the case of *Pennsylvania Lumbermen's Mutual Fire Insurance Company v. Meyer,* 197 U. S., 407, 25 S. Ct., 483, 49 L. Ed., 810, holds that a foreign insurance company is doing business within the state so far as the question of the power of a Federal Court, sitting in that State, to obtain jurisdiction is concerned, where under the terms of its policies covering property in that State, it sends its agents there to adjust losses.

In the case of *Commercial Mutual Accident Company v. Davis,* 213 U. S., 245, 29 S. Ct., 445, 447, 53 L. Ed., 782, it was held that the medical representative of a foreign insurance company, who comes into the state clothed with full authority to adjust a claim, is one "who adjusts or settles a loss," within the meaning of a Missouri statute providing for the service of process on local agents, although in fact such loss is not actually settled. It was further held in that case that a state may provide for the service of process in an action against a foreign insurance company upon any person within the state who adjusts a loss, as Missouri has done. It was further held in the same case that a foreign insurance company which has policies in the state, and which has the right to investigate losses thereunder, does business in the State.

Under the foregoing decisions of the United States Supreme Court, it is readily apparent that the State, which accords a corporation privileges, and which affords protection to it, and which gives it the benefit of its laws, may also exact reciprocal duties in return, regardless of how artfully it may devise stratagems intended to circumvent the rights of the State and of its citizens.

Applying the Federal rule and our own rule that each case must depend upon its own facts, and applying other principles which have been stated herein, this Court in the very recent case of *Jones v. General Motors Corporation,* 197 S. C., 129, 14 S. E. (2d), 628, 630, decided the exact issues involved here upon a state of facts as nearly identical with those in the present case as could be expected to be found in any reported case.

In the *Jones case,* the plaintiff alleged that he purchased a Buick automobile manufactured by the defendant from a dealer at Easley, South Carolina, under a warranty that the automobile was of good workmanship, in sound condition, and that the defendant, within a period of ninety days, and before said car had been driven 4,000 miles, would repair any defects which might appear or develop therein. It is further alleged that within said period and after the car had been driven about 1,750 miles, the motor proved to be seriously defective in various particulars, and that although plaintiff promptly notified the defendant thereof, it failed to make proper repairs, and thereby breached its warranty, to plaintiff's damage. The summons, without complaint attached, was served on one R. B. Deal, while he was temporarily in the State. The defendant made no appearance at that time, and judgment was rendered against it. Thereafter, the defendant having been notified of the judgment, specially appeared for the sole purpose of making a motion to set aside and vacate the default judgment, and at a hearing thereon each side submitted affidavits.

Letters were in evidence, written to the plaintiff by the General Motors Sales Corporation, Buick Motor Division of Atlanta, Georgia, showing that plaintiff had complained to the corporation relative to the defects in his car. The automobile not having been satisfactorily repaired, or not having been repaired at all, plaintiff wrote a letter to Mr. Alfred P. Sloan, president of the defendant, seeking to have the condition remedied. To this letter he received a reply from

the defendant corporation, stating that: "Our warranty which is similar to that of all manufacturers provides for the repair or replacement of any parts which may prove defective within the warranty period. We have always interpreted this warranty in such a manner as to properly protect the equities of all concerned." The letter further stated: "It is of course difficult from this distance to attempt to make any specific comments on your problem but in order that it may receive every possible consideration we are asking Mr. E. E. McIndoo, Buick Zone Manager at Atlanta, who has complete supervision over all Buick activities in your area, to review it further for you."

A few days thereafter plaintiff received a telegram from Mr. McIndoo, informing him: "Our *representative* [italics added] will telephone you late today or early tomorrow morning and make definite appointment with you to meet him in Easley." Pursuant to the telegram, the plaintiff met Mr. R. B. Deal at Easley, whereupon, according to plaintiff, Mr. Deal told him that he had come at the instance of the defendant to attempt if possible to adjust plaintiff's grievances with reference to the defective motor. After further discussion and after the car had been tested, summons was served upon Mr. Deal. In a subsequent conversation, Mr. Deal explained that it was his duty to travel several States in the interest of the defendant, adjusting and attempting to adjust such matters as had brought him to Easley. It is true that in that case Mr. Deal, after service had been made upon him, held himself out as an adjuster for the defendant. The word "adjuster" was not used in the case at bar, but in other respects the facts are strikingly parallel. The affidavits, submitted by the defendant in that case, denied that Mr. Deal was its agent or employee, denied that Mr. McIndoo was its agent, and denied that it was doing business in South Carolina, or that it had ever done so. Upon this state of facts this Court held:

"There is no one invariable or universal test by which it may be determined whether the person served in an action against a foreign corporation was a proper or competent person for that purpose. The term 'any agent,' as used in our statute (Section 434, 1932, Code), providing for service on foreign corporations, does not require that the agency be general, but the statute is complied with by service upon an agent having limited authority to represent the corporation. The words 'any agent,' as used in the statute, were intended to have a broad meaning, and must be liberally construed to effectuate the legislative intent. *Forbes v. Kingan & Company,* 174 S. C., 24, 176 S. E., 880. Generally, the person served must have some measure of control over the business intrusted to him, or of some feature thereof, and not a mere subordinate employee, without discretion. He must have representative capacity and derivative authority.

"The test usually applied is, whether the agent served sustains such relation to the corporation or to the business out of which the alleged cause of action arose as to justify a fair and reasonable inference of a duty on his part to communicate the fact of service to the corporation. In other words, process must be served on an agent having such a relation to the corporation that notice to the agent may well be deemed notice to the principal, without a violation of the principles of natural justice. *It is not the descriptive name employed, but the nature of the business and the extent of authority given and exercised, which is determinative.* [Emphasis added.] [Citing cases.]

"If it appears that there is a law of the state in respect to the service of process on foreign corporations, and that the character of the agency is such as to render it fair, reasonable and just to imply an authority on the part of the agent to receive service the law will and ought to draw such an inference and to imply such authority, and service under such circumstances and upon an agent of that character will be sufficient. [Citing cases.]

"The provisions of our statute (Code, Section 434), dealing with the service of process upon foreign corporations, and with special reference to the particular issue before us, have been discussed by our Court in numerous cases, and applied under variant circumstances. [Citing cases.]

"Analyzing the letter written by defendant to the plaintiff, and considering the unbroken sequence of events which followed, we think there can be no doubt that a sufficient showing has been made that General Motors Sales Corporation, acting through R. B. Deal, was an agent of the defendant upon whom process might be served. Deal was a representative of the defendant corporation with derivative authority, and was acting for it in respect to the very transaction out of which the action arose, and we can see no reason why service on him was not service upon the defendant corporation; or why the defendant corporation was not, in the person of Deal, and during the time covered by his presence in the state for such purpose, present itself within the state. It is significant, too, that the defendant makes no contention that R. B. Deal, the person upon whom the process was served, failed to transmit the summons in this action to it, and nowhere does the defendant intimate that it lacked knowledge of the pendency of the action.

"The facts in this case are substantially the same as those presented in *Abbeville Electric Light & Power Company v. Western Electrical Supply Company, supra* [61 S. C. 361, 39 S. E. 559, 55 L. R. A. 146, 85 Am. St. Rep. 890] in which this court, after a full discussion of the authorities, held that the agent of a foreign corporation, temporarily in this state on a mission concerning the very matter over which the action arose, was the proper person upon whom process might be served to acquire jurisdiction. And see Annotation, 113 A. L. R. 9, 145.

\*       \*       \*

"We have held that where a foreign corporation sends an agent into the state for the transaction of its corporate

business—a business or transaction out of which the cause of action arises—it may be regarded as doing business in the state to the extent that service of process upon such agent will give the courts of this state jurisdiction. This rule is based upon an implication arising from the facts of the case that the corporation does business or has business in the state for the transaction of which it sends an agent here. It prevails where the officer or agent is in the state with reference to the settlement or adjustment of the claim sued upon, since in such case the mere presence of the officer or agent for such a purpose may be held to constitute the doing of business in the state. [Citing cases.]

\* \* \*

"In our opinion, the defendant was 'doing business' in South Carolina within the meaning of the decisions of this court and process was duly served upon its agent so as to give jurisdiction to the courts of this State."

It is true that in the *Jones case,* as Judge Mann has pointed out, Mr. Deal held himself out to be an adjuster for the defendant (which was denied by the defendant) and that in the present case the expression "adjuster" did not arise. However, the *Jones case* was not decided on the strength of Mr. Deal's title, the decision expressly stating that: "It is not the descriptive name employed, but the nature of the business and the extent of authority given and exercised, which is determinative." It is significant that in the *Jones case* and in the present case, the person contemplated to be sent in connection with the dispute between the parties was referred to by each defendant corporation as its "representative." It will also be observed that in the *Jones case,* the fact that the defendant was doing business in this State was established solely on the proof of the agency of this representative, without considering the further evidence of the terms of the contract between the defendant and its dealer. In the present case the proof of business done by the respondent under the terms of its contract with D. W. Gavin & Com-

pany, Inc., combined with the proof of business done by the respondent through its agent, C. E. McAlister, is even stronger evidence that the respondent was doing business here than was presented in the *Jones case*.

In another respect it appears that the order of Judge Mann was manifestly influenced or controlled by an error of law, in that it is based upon a misapprehension of the meaning, or upon an oversight of, the provisions of Section 7773 of the Code of 1932, in the chapter entitled "Foreign Corporations," which section reads:

"It shall be a further condition precedent to the right of any such corporation to do business in this State, that it shall be taken and deemed to be the fact irrebuttable, and part and parcel of all contracts entered into between such corporation and a citizen or corporation of this state, that the taking or receiving, from any citizen or corporation of this State, of any charge, fee, payment, toll, impost, premium or other moneyed or valuable consideration, under or in performance of any such contract, or of any condition of the same, shall constitute the doing of its corporate business within this State, and that the place of the making and of performance of such contract shall be deemed and held to be within this State, anything contained in such contract or any rules or by-laws of such corporation to the contrary notwithstanding."

In the case of *British American Mortgage Company v. Jones, Comptroller-General,* 76 S. C., 218, at page 220, 56 S. E., 983, at page 984, this Court said: "The first question that will be considered is, whether the facts show that the petitioner was doing business in this state." The opinion in that case then proceeds to quote the above section of our Code, which was then Section 1787, following which the Court reached the conclusion that: "This section clearly shows that the petitioner was doing business in this state."

In the case of *Owen v. Bankers Life Insurance Company,* 84 S. C., 253, at page 255, 66 S. E., 290, at page 291, 137

Am. St. Rep., 845, this Court said: "The defendant contends, * * * that by the terms of the application and policy the contract must be governed by the laws of the state of New York; * * *. The contract does provide that it is subject to the laws of the state of New York." The Court then quoted the above section of our Code, which was then Section 1787, and after citing another statute, said on page 256, of 84 S. C., on page 292 of 66 S. E.:

"In the face of these statutes, we must hold that this is a South Carolina contract, solvable according to our laws. * * *

"There is no force in appellant's contention that such a construction of the statutes impairs the obligation of the contract, and renders the statutes obnoxious to the Constitution, for the contract was made with reference to the statutes. In *Adler v. Cloud*, 42 S. C. [272], 291, 20 S. E. [393], 400, the Court said: 'It has been repeatedly held by this court and the United States Supreme Court, that every contract made embodies the law governing such contracts as much as if so stipulated in the contract in express terms'."

This section of our Code was also referred to in the case of *Livingston v. Atlantic Coast Line R. Co.*, 176 S. C., 385, at page 390, 180 S. E., 343, at page 345, a recent decision, in which this Court said that Section 7773, "is designed to protect citizens of South Carolina, dealing with foreign corporations of the character of such insurance companies."

The respondent may contend that its activities are not controlled by Section 7773 for the reason that it has not intended to subject itself thereto, but no weight can be given to such an argument, for as this Court has said in the case of *Lipe v. Carolina, C. & O. Railway Company*, 123 S. C., 515, at page 524, 116 S. E., 101, at page 104, 30 A. L. R., 248:

"* * * To go further and hold that, because the foreign corporation, doing business in the state through agents amendable to process, has not complied with the state

laws and has not intended to subject itself to the jurisdiction of the state courts, it may not be held liable in the same manner and to the same extent as another foreign corporation legally doing a similar business, would amount to penalizing the law-abiding, foreign corporation, and placing a premium upon outlawry. The test in this aspect of the question lies, as we think, not in the express or implied consent of a foreign corporation to a state's jurisdiction, but in whether it is actually present within the jurisdiction and subject thereto; that is, doing business therein through agents in fact, who may be reached by the personal service of process within the state." (Citing several decisions of the United States Supreme Court.)

Any other interpretation of the law would give respondent superior rights to those possessed by corporations of this State, and to those corporations properly domesticated therein. Section 7764 of the Code of 1932 provides that foreign corporations may carry on business within this State "in like manner and with like powers as corporations of like kind and class created under the laws of this State," and thus does not grant superior immunities to foreign corporations. It is almost superfluous to add that in its dealings with D. W. Gavin & Company, Inc., respondent, under the terms of the contract which has been synopsized herein, brought itself within the meaning of Section 7773 of the Code, for it is obvious that respondent did receive from its dealer, which was a South Carolina corporation, such charges, payments or other moneyed or valuable consideration specified in that section of our statutes.

It might further be remarked in passing that respondent's letter to plaintiff, dated April 1, 1941, mentions the fact that plaintiff purchased his truck "through" respondent's dealer, and not "from" such dealer.

In addition to holding that respondent was not doing business in South Carolina, Judge Mann has also concluded that C. E. McAlister was not its agent, and that therefore no service was made upon the corporation. As has already been

pointed out herein, much that has been said on the first subject in his opinion applies also to the latter because of the interlocking treatment of the two subjects by many of the authorities quoted. Some matters remain, however, which apply solely to the question of service.

Section 434 of the Code of 1932 provides:

"The summons shall be served by delivering a copy thereof as follows:

"(1) If the suit be against a corporation, to the president or other head of the corporation, secretary, cashier, treasurer, a director or agent thereof. *  *  *

"Such sevice can be made in respect to a foreign corporation only when it has property within the State, or the cause of action arose therein, or where such service shall be made in this State personally upon the president, cashier, treasurer, attorney or secretary, or any agent thereof. *  *  * "

A review of respondent's contract with its dealer reveals the property rights retained and exercised by respondent in relation to its automobiles, trucks and other products. Except in certain instances, "title to all Company products *  *  * shall be and remain with Company until actual receipt of the full purchase price in cash by Company." It is needless to quote similar provisions having the same import, for it is clear that respondent exercises dominion over, and property rights in, its products within this State, for it specifically reserves the right under certain conditions to retake and resell products which it has manufactured and which it disposes of through its dealers in this State. Nor can it be disputed that the cause of action, in which plaintiff purchased, at St. George, South Carolina, an allegedly defective truck, together with respondent's warranty, arose in this State. Therefore the sole remaining question pertaining to service is whether the summons was served upon respondent's agent.

Judge Mann has based his order, in this respect, largely upon his finding that C. E. McAlister lacked the power to enter into contractual obligations on be-

half of his principal. Clearly Judge Mann, in his interpretation of the phrase "any agent" as used in the statute, has based his finding upon a misconstruction of its meaning. Therefore his conclusion of law, based upon an erroneous conception of the legal meaning of that phrase, is a misconception in that respect of the law of agency.

It is true that the power to contract for one's principal is strong evidence of agency, but it is only one means by which agency can be shown, and does not constitute the sole test as to its existence. Agency may be shown by the fact that a person represents his principal in some one or more of his relations to others, even though he lacks contractual power. This Court has said, in the case of *Jenkins v. Penn Bridge Company*, 73 S. C., 526, at page 532, 53 S. E., 991, at page 993, that:

" * * * The statute makes service on 'any agent' of a foreign corporation sufficient. The statute, therefore, does not require that the agent shall be general, but is complied with by a service upon an agent having limited authority to represent his principal."

In the foregoing case it was held that service upon a timekeeper of a foreign corporation doing a piece of construction work in this State is a good service on the foreign corporation. In the case of *H. L. & L. F. Mc-Swain v. Adams Grain & Provision Company*, 93 S. C., 103, 76 S. E., 117, it was held that a broker selling corn for a non-resident corporation on commissions paid by the corporation is such an agent as that service on him would give the Courts of the State jurisdiction of the corporation. The case of *Dyar v. Georgia Power Company*, 173 S. C., 527, 176 S. E., 711, which is referred to in several other decisions, is not applicable to the facts of the present case because in the *Dyar case* attempted service was made upon an attorney at law who had not been retained to represent the defendant in that litigation, and who, being an attorney at law, would not, except by express authority, have power to accept service of process which institutes a suit. In that case,

service was also attempted to be made upon a citizen of another State who was in this State for the purpose of attending Court as a witness, and this Court held that the party was immune from suit or service of process for that reason. Neither of these conditions exists in the present case. The *Dyar case,* however, in a different respect, is applicable to the present case in relation to its holding, on page 537 of 173 S. C., on page 715 of 176 S. E., that: "We construe section 434 to mean that if a foreign corporation has property in the state it may be brought into the jurisdiction of the courts by the proper service of process upon it." Naturally, the parties sought to be served there were not proper parties, and the duties of the parties there sought to be served have no relation to the duties of C. E. McAlister, who, according to the affidavit of J. J. Donavan, manager of respondent's Charlotte branch, submitted by the respondent (and according to Mr. McAlister's admissions in his own affidavit), "is now, and since November, 1938, has been, employed by the Charlotte Branch of Ford Motor Company in the capacity of Service Representative." The advisory powers of Mr. McAlister, and his other regular duties in this State, under the jurisdiction of the Charlotte branch, have already been discussed and need not now be repeated. Nor will it be forgotten that plaintiff's affidavit alleged that C. E. McAlister stated to him that respondent had sent McAlister as its agent and representative regarding the defects in plaintiff's Ford truck.

The respondent has argued the principle that a trial Court's findings on an issue "of this type" are conclusive if supported by any evidence. There is, however, ample authority for the further principle of law (*Lipe v. Carolina, C. & O. Railway Company, supra; State of South Carolina v. W. T. Rawleigh Co., supra*) that findings of fact by the Circuit Judge may be reviewed by this Court where such findings are manifestly influenced or controlled by error of law. Judge Mann's interpretation of the meaning of the term "any agent" in the statute is not a finding

of fact, and therefore could be reviewed by this Court regardless of the foregoing principle governing findings which are controlled by error of law, such findings being findings of fact. As to such factual findings of Judge Mann which are controlled by an error of law, and which have been discussed herein, the principle discussed in the *Lipe case* does govern such findings.

Judgment reversed.

MESSRS. ASSOCIATE JUSTICES FISHBURNE and STUKES, and CIRCUIT JUDGES PHILIP H. STOLL and E. H. HENDERSON, ACTING ASSOCIATE JUSTICES, concur.