## 17690

John D. BONEY, Appellant, v. TRANS-STATE DREDGING CO., Respondent, J. Elmo LEWIS, Appellant, v. TRANS-STATE DREDGING CO., Respondent

(115 S. E. (2d) 508)

*Messrs. Murdaugh, Eltzroth & Peters,* of Hampton, *for Appellants,*

*Messrs. W. L. Rhodes, Jr.,* of Hampton, *Blatt & Fales,* of Barnwell, and *Lawton, O'Donnel & Sipple,* of Savannah, Ga., *for Respondent,*

August 2, 1960.

LEGGE, Justice.

In each of these two tort actions the defendant, a Florida corporation not domesticated in South Carolina, appearing specially, moved to set aside the attempted service of the summons as ineffectual to bring it within the court's jurisdiction. Such service having been made in both cases at the same time and place and in the same manner, the motions were argued together; and in a single order the circuit court sustained them and dismissed the complaints. From that order the plaintiffs have appealed.

The complaints alleged in substance that on March 28, 1959, the plaintiffs, residents of Allendale County, South Carolina, were traveling downstream on the Savannah River at a point some five miles upstream from the point where U. S. Highway 301 (which traverses Allendale County in a northeast-southwest direction) crosses it; that

at said time and place the defendant was engaged in dredging operations on the South Carolina side of the river; and that the plaintiffs, having signaled for permission to pass defendant's dredge, and having been signaled to proceed, attempted to pass between the dredge and the South Carolina bank of the river, when suddenly and without warning, as the result of its negligent operation by defendant's agents, the dredge shifted its position, causing a cable that ran from the dredge, under the surface of the river, to the South Carolina bank, to rise up and overturn the boat in which the plaintiffs were traveling, thereby causing injury and damage to them.

Commencement of these actions, *in personam,* was sought by two methods:

1. Substituted service of the summons upon the Secretary of State of South Carolina pursuant to Section 12-722 of the 1952 Code; and

2. Personal service upon an employee of the defendant corporation.

The circuit court held the attempted service ineffectual because, in its judgment:

1. At the time of the alleged accident and of the attempted service the defendant was not doing business in this State within the meaning of Section 12-722; and

2. The defendant's employee to whom copies of the summonses were delivered on or about August 29, 1959, was not an officer or agent upon whom valid service could be made under Section 10-421.

Section 12-722 reads as follows:

"Whenever any foreign corporation transacts business in this State without first having complied with the provisions of § 12-721 and pursuant thereto designating a principal place of business or place of location of such corporation in this State at which all legal process may be served, the foreign corporation so transacting business in this State without complying with said section shall be deemed to have

designated the Secretary of State as its true and lawful agent upon whom may be served all legal process in any action or proceeding against such foreign corporation growing out of the transaction of any business in this State. Nothing herein shall apply to insurance companies or associations required to pay fees to the Department of Insurance of this State."

The crucial issue here is: Was the defendant doing business in this State at the time of the accident? If that issue be resolved in the affirmative, the substituted service under Section 12-722 was good. That Section does not require that the defendant be doing business in this State at the time of such service.

The facts upon which defendant's motions were presented to the circuit judge are not in dispute. They appear in the affidavits of Patrick Henry Sturm, the captain of the dredge, B. A. Bittan, Jr., the secretary of the defendant corporation, and C. A. Boyd, leverman on the dredge, as follows:

*Captain Sturm:* Deponent, a resident of Lake Wales, Florida, was in charge of defendant's dredging operations on the Savannah River under its contract with the United States Corps of Army Engineers, Savannah District. These operations entailed removal of sand bars and making of land cuts over an area of 142 river miles, *i. e.,* from Mile 212, approximately 12 river miles below Augusta, Georgia, to Mile, 70, above Savannah; they commenced on October 29, 1958, and were completed on September 2, 1959. The work was "around the clock" on three eight-hour shifts. The crew, none of whom came from South Carolina, were lodged and took their meals on the Georgia side of the river. Supplies and equipment were procured from Georgia and Florida; none from South Carolina. Between October, 1958, and April, 1959, operations were based on Augusta, the defendant's headquarters and office being in a hotel there. In April, 1959, the headquarters were moved to a trailer at Sylvania, Georgia. During the entire operation defendant had no office in South Carolina. Equipment used on the Savannah River

job consisted of a dredge, an oil barge, a tug, a crewboat, and twenty-four sets of pontoons. To straighten the channel by eliminating sharp bends of the river twelve land cuts were made through its banks on both sides, seven on the Georgia side and five on the South Carolina side. On August 28, 1959, the dredge was located on the Georgia side of the river at point Mile 71 from Savannah; and it remained on that side until August 31, when it dredged out a sand bar on the South Carolina side from about 8:00 p. m. to 11:00 p. m. It then moved back to point Mile 70.5 on the Georgia side to remove some logs and clean up some spots that had caved in; and it remained on the Georgia side until this clean-up work, which was completed on September 2, finished the job. C. A. Boyd, the leverman on the dredge, to whom the summonses were delivered on or about September 1, was not a permanent employee of the defendant; he was a transient dredge worker whom deponent had employed on defendant's behalf in January, 1959, for the duration of the Savannah River job. Boyd's duty was to operate the levers during his shift; he had no authority with respect to defendant's activities except such as was given to him by deponent, his immediate supervisor. Deponent was not present when the summonses were delivered to Boyd; and he had never given Boyd authority to accept any summons or other legal paper in deponent's absence.

*B. A. Bittan, Jr.:* Deponent, a resident of St. Lucie County, Florida, is secretary of the defendant, a Florida corporation not domesticated in South Carolina and owning no property there. Defendant has never maintained any facilities in South Carolina, nor has it ever paid any unemployment compensation tax to that State. The only connection that defendant had with the State of South Carolina during the dredging and bank revetment job on the Savannah River was that it "did dredge the bottom of the channel of the Savannah River from Mile 212.1 to Mile 71.0, and in the event that South Carolina territorial boundary is the center of the Savannah River, to that extent Trans-State Dredging Com-

pany had occasion to do work in South Carolina." That during the performance of said work all facilities, purchasing arrangements, equipment and headquarters of the defendant were located and conducted in either Florida or Georgia.

*C. A. Boyd:* Operator and leverman of the dredge, and so employed for about nine months prior to October, 1959. On September 1, 1959, while the dredge was spudded on the Georgia side of the river about Mile 80 from Savannah, a man came in a boat from the South Carolina side and asked to see the captain, saying that he had some papers to serve. Deponent stated to him that he had no authority to take any papers, and that he did not know when he would see the captain; whereupon the man left the papers aboard the dredge and returned to the South Carolina side.

No universal formula has been, or is likely to be, devised for determining what constitutes "doing business" by a foreign corporation within a state in such sense as to subject it to the jurisdiction of the courts of that state. The question must be resolved upon the facts of the particular case. *Jones v. General Motors Corporation,* 197 S. C. 129, 14 S. E. (2d) 628; *State v. Ford Motor Co.,* 208 S. C. 379, 38 S. E. (2d) 242.

Recent decisions of both federal and state courts have tended to discard older concepts whereby jurisdiction was accorded on the fictional premise of the corporation's implied consent or on the theory that the corporation is "present" wherever its activities are carried on, and to substitute therefor, as the jurisdictional test, the requirement that the corporation have such contact with the state of the forum "that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. State of Washington,* 326 U. S. 310, 66 S. Ct. 154, 158, 90 L. Ed. 95, 161 A. L. R. 1057; *Travelers Health Association v. Virginia,* 339 U. S. 643, 70 S. Ct. 927, 94 L. Ed. 1154; *Perkins v. Benguet Consol. Mining Co.,* 342 U. S. 437, 72 S. Ct. 413, 96 L. Ed. 485; *McGee v. Inter-*

*national Life Ins. Co.,* 355 U. S. 220, 78 S. Ct. 199, 2 L. Ed. (2d) 223; *State v. Ford Motor Co., supra; Ross v. American Income Life Ins. Co.,* 232 S. C. 433, 102 S. E. (2d) 743; *Erlanger Mills v. Cohoes Fibre Mills,* 4 Cir., 239 F. (2d) 502; *Kilpatrick v. Texas & P. Ry. Co.,* 2 Cir., 166 F. (2d) 788; *Smyth v. Twin State Improvement Corp.,* 116 Vt. 569, 80 A. (2d) 664, 25 A. L. R. (2d) 1193.

That this principle is in itself nebulous is evident from its statement. But in its application we are directed by the authorities just cited to certain considerations that are of help in the solution of the problem in most cases, and seem important here. Among them are the duration of the corporate activity in the state of the forum; the character of the acts giving rise to the suit, and the circumstances of their commission; and the balancing of the inconvenience to the parties, respectively, of a trial in that state on the one hand and in the state of the corporate domicile on the other.

"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. The test is not merely, as has sometimes been suggested, whether the activity, which the corporation has seen fit to procure through its agents in another state, is a little more or a little less. * * * Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties or relations * * *.

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obli-

gations; and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." *International Shoe Co. v. State of Washington, supra.*

Whether, as was held in *Smyth v. Twin State Improvement Corp., supra,* jurisdiction may be justified from the commission of a single tortious act within the state although the corporation may not have been "doing business" in the generally accepted constitutional sense of that phrase, is a question that we need not decide here. In the case at bar the defendant's operations extended over a continuous period of more than ten months and over an area of one hundred forty-two miles of the Savannah River, the middle of which (except where there are islands, and in that case a line midway between the island bank and the South Carolina shore) is the boundary between South Carolina and Georgia. *State of Georgia v. State of South Carolina,* 257 U. S. 516, 42 S. Ct. 173, 66 L. Ed. 347; 259 U. S. 572, 66 L. Ed. 1069. Those operations were such as were normally incident to the defendant's business; they were conducted, of necessity, sometimes in Georgia and sometimes in South Carolina; they required dredging on both sides of the boundary; they required cutting of banks on both sides of the river to make a new channel. In the present state of the record it appears uncontroverted that the accident from which this action resulted occurred in the course of those operations and when defendant's dredge was moored to the South Carolina bank by a cable, the sudden lifting of which overturned the plaintiffs' boat. We are of opinion that the defendant's said operations, although not continuously performed in South Carolina, constituted corporate activity within that state sufficient to meet the test before referred to and therefore to render the defendant subject to the jurisdiction of its courts. Having so concluded, we hold that the substituted service of the summons under Section

64

12-722 was proper and sufficient; and it therefore becomes unnecessary to pass upon the validity of the attempted personal service.

It is not clear from the record before us whether or not the complaints have been served. The defendant may plead to them within twenty days after their service or within a like period after notice of the filing of the remittitur herein, as the case may be.

Reversed and remanded.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.