Marie L. SZANTAY, ancillary administra-
trix c.t.a. of the estate of Elmer D.
Szantay, Plaintiff,

v.

BEECH AIRCRAFT CORPORATION, a
corporation, et al., Defendants.

Ova N. WEIGER, Mother of S. Wayne
Weiger, Deceased, etc., Plaintiff,

v.

DIXIE AVIATION COMPANY, Inc., et al.,
Defendants.

Margaret CLEMENS, surviving widow of
James J. Clemens, Deceased, etc.,
Plaintiff,

v.

DIXIE AVIATION COMPANY, Inc., et al.,
Defendants.

Civ. A. Nos. AC–1105, AC–1107,
AC–1108.

United States District Court
E. D. South Carolina,
Columbia Division.

Jan. 19, 1965.

---

D. W. Robinson, II, and Henry Hammer, Columbia, S. C., for plaintiffs.

E. W. Mullins, Columbia, S. C., for defendants.

HEMPHILL, Chief Judge.

Defendant Beech Aircraft Corporation, asserting that it is a Delaware Corporation with its principal place of business in Wichita, Kansas, that it is not domesticated in South Carolina, and that it had no agent and neither engaged or engages in business activities in the State, seeks to quash service of process upon it and dismiss the complaints for want of jurisdiction. Concomitant is the contention that Beech, because of the asserted facts, has not been properly served with process in any of these actions. Service was effectuated in two ways: by service through the Secretary of State and by service on Hawthorne Aero Sales, Inc., purportedly an agent of Beech. This service was attempted under the statutes cited under footnote 1, infra.

These are companion actions, instituted for the alleged wrongful deaths of both intestates at the hands of defendants. Recovery is sought from defendant Beech Aircraft Corporation (hereinafter called Beech) for the negligent manufacture and design of the airplane in which both deceased were riding; recovery from defendant Dixie Aviation Company, of Columbia, S. C., for negligent servicing of the craft.

Not necessary, but helpful to this determination, is a history of events which shows the craft in question as being sold by Robert Craf, Inc., a Nebraska Corporation, to deceased Elmer D. Szantay, who later flew the plane to Miami, Florida, planned return to Chicago. On return route an overnight stop was made at Columbia, S. C., where the plane was serviced by defendant Dixie Aviation Company. While enroute from Columbia to Chicago the plane crashed near Jellico, Tennessee, on April 1, 1962, with resulting death to the intestates.

The issue upon which this motion to quash service of process lies is whether or not defendant Beech was "present" in this jurisdiction, i. e., were the contacts of Beech sufficient to say that it was "doing business" in South Carolina during the times in question? The South Carolina statutes applicable use the word "transacting business,"[1] which has no different connotation than explained in Shealy v. Challenger Mfg. Co., 304 F.2d 102 (4th Cir. 1962).

The Court resorts to the record before it to determine what contacts Beech had with the State of the forum. Admittedly Beech is not domesticated in South Carolina. Plainly, plaintiff must rely on the relationship, the course of conduct, the control, in essence the contract and resulting "involvement" between Beech and Hawthorne Aero Sales, admitted "distributor" for Beech in South Carolina. Hawthorne is not a party to this suit.

The record does show that Beech, through its control of Hawthorne, has such substantial contact with South Carolina so that holding it amenable to service of process does "not offend 'traditional notions of fair play and substantial justice.'" International Shoe Co. v. State of Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L.Ed. 95.

The amount of control exercised by Beech is readily apparent upon consider-

[1.] Note §§ 10–421, 10–423, 10–424, 12–721, and 12–722, S.C.Code. 1962. [Sections 12–721 and 12–722 were *repealed* by the General Assembly of S. C., effective January 1, 1964, but provision was made that such repeal would "not affect any right accrued or established, or any liability or penalty incurred, under the provisions of such act prior to its repeal." The instant actions were filed in 1963.

ation of several determinative factors. These salient factors appear in the contract between Beech and Hawthorne, including addenda such as the sales policy manual, and other incidental papers in the record. Implementation of such contract is outlined in the deposition testimony of John M. Hawkins, President of Hawthorne.

The sales territory assigned Hawthorne by Beech consisting of parts of South Carolina,[2] Georgia and Florida is exclusive, with certain exceptions for sales directly by Beech to governmental agencies, fleet purchases and new model airplanes (which sales Hawthorne is prohibited from making.)

The contract between Beech and Hawthorne provides that:

"Beech agrees that for so long as this agreement is in effect, Beech will not designate any other person, firm or corporation as distributor in said territory; that Beech *will not give* discounts on the sales of new Beechcraft Airplanes to any other person, firm or corporation within said territory * * *; and that Beech will not sell any new Beechcraft airplanes in said territory otherwise than to distributor; * * *"

Hawthorne is prohibited from assigning its rights to this area to another without Beech's approval. Further, it is prohibited from making sales outside this territory without paying certain fees to the distributor of that territory. For example, the contract provides:

"* * * BEECH shall determine:
"(1) When an irregular sale has occurred,
"(2) The distributors involved,
"(3) The irregular sales fee to be paid.
"Such determinations by BEECH shall be final and binding."

Hawthorne is responsible for "* * * the development of Beechcraft sales and service within his *assigned territory only* * * *."

### Minimum Quotas and Demonstrators

Beech establishes and maintains minimum quotas for the number of new airplanes Hawthorne must buy from it each year (regardless of market requirements), the number it must have on hand at all times, and their status. In addition, Hawthorne agrees

"To maintain such demonstrators as Beech deems necessary to the proper development of distributor's territory, and to Beech policies relating thereto * * *"

the exact number of which is spelled out in the addenda to the contract. For some models, Beech itself furnishes the demonstrators for a nominal fee. Monthly inventory reports of aircraft on hand are required of Hawthorne by Beech

### Advertising and Trade Names

Hawthorne can use only that advertising which is supplied or approved by Beech. It must cease the use of any such material which might be disapproved by Beech, and it cannot advertise out of its territory.

Hawthorne agrees to display Beech's outdoor signs and such other Beech signs as are "necessary to advertise the business properly." These signs are in fact on display. Hawthorne advertises itself as a Beech distributor.

Beech retains exclusive claim to its "Beechcraft" trade name, with Hawthorne losing all right to use the same on termination of the agreement. Hawthorne may not use the name in its own corporate name.

Finally, Beech agrees to pay 50% of the cost of advertising in the yellow pages of the local Charleston Telephone Directory, if Hawthorne uses the Beech advertising agent. In addition, Beech will reimburse Hawthorne for 50% of its advertising cost of soliciting new salesmen.

### Accounting and Inspections

The contract provides:

"* * * Distributor agrees to maintain an accounting system

---

2. Thirty-five counties in the State.

which will permit operating reports to Beech, thus cooperating with this mutual interest and to furnish Beech such monthly annual operating reports. Beech agrees to furnish forms upon which this information shall be provided, *such information to be received by Beech by the 15th of the following month*. Distributor agrees to supply Beech with any other financial and/or accounting information as requested." [Emphasis in original.]

To insure that these reports are accurate Beech retains the right to inspect Hawthorne's "business facilities, records, supplies and personnel," apparently at any time.

### Prices

Beech retains the right to change the discounts and prices of airplanes and parts to Hawthorne at any time, without prior notice to Hawthorne. Furthermore, Beech "recommends" the sales price at which Hawthorne can retail its airplanes. For example, the agreement provides:

"Prices of airplanes, required deposits and discounts applicable thereto, and other terms of purchase *shall* be as set forth in the BEECH-CRAFT SALES POLICY MANUAL." [Emphasis supplied.]

### Spare Parts

Beech requires Hawthorne to buy and "* * * at all times to keep on hand and to offer for sale at his place of business a current supply of such genuine Beech spare parts and accessories sufficient to supply adequately the requirements of the territory designated herein." Beech, on the other hand, promises to assist Hawthorne by endeavoring "* * * to establish special arrangements with the manufacturers of parts and accessories not manufactured by Beech in order that purchases thereof by distributor may be made promptly and efficient service rendered with respect thereto."

Hawthorne is prohibited from selling or installing any structural part on Beech airplanes unless the part is manufactured by Beech, without Beech's permission. Similarly, Hawthorne is forbidden to sell or install any parts, equipment or accessories which have been listed by Beech as disapproved.

### Purchase Forms and Warranties

Hawthorne is required to use the forms furnished by Beech in ordering airplanes. Furthermore, Hawthorne is directed to, and does, use only the forms furnished by Beech in selling the equipment at retail. These forms contain the same warranties given Hawthorne by Beech, and thus Beech is directing Hawthorne to pass on its warranty to the customer. The entire procedure for ordering and delivery of airplanes is tightly regulated by Beech.

### Financing

Through its wholly-owned subsidiary, Beech Acceptance Corporation, Beech affords its dealers a source to finance the distributors' purchases. Many of the directors of Beech serve in the same capacity with Beech Acceptance Corporation. Hawthorne, in fact, uses this service, and the collateral mortgages held by Beech Acceptance Corporation are customarily recorded in Charleston, South Carolina.

### Termination

In order that new annual sales quotas may be established each year, the agreement between Hawthorne and Beech terminates on December 31. Otherwise the relationship can be terminated by either party on 30 days' notice, or expires automatically upon the insolvency, bankruptcy, etc. of Hawthorne. Upon termination, Beech retains the right to repurchase all of Hawthorne's usable airplane inventory, spare parts, signs, etc. Furthermore Beech is subrogated to Hawthorne's equity rights in any mortgaged Beechcraft new planes and parts.

### Servicing

Primary responsibility for servicing Beech aircraft is placed upon Hawthorne. Hawthorne agrees to "purchase special tools developed by Beech which Beech

deems essential to properly service Beechcraft airplanes," and to comply with all Beech service directives which may from time to time be furnished by Beech. Periodically, Beech service personnel visit Hawthorne in Charleston and remain available to Hawthorne upon call. As a Certified Service Station, Hawthorne stocks a complete supply of Beech service publications, bulletins and letters.

Hawthorne conducts, and encourages its customers to attend training programs and clinics on servicing which Beech advertises through the owner's manuals which accompany each new airplane as standard equipment. More important, *Beech personnel regularly conduct training clinics for Hawthorne personnel in Charleston, South Carolina,* as well as in Wichita, Kansas. Note too the following from the owner's manual, given to purchasers of the aircraft in question.

"Should a special problem arise concerning your Barron, your BEECHCRAFT Certified Service Station, dealer or distributor will supply the information, or if necessary, he will enlist the services of factory personnel through the Customer Service Division."

Also

"To bring the latest authoritative information to BEECHCRAFT distributors, dealers and Certified Service Stations and to you as the owner of a BEECHCRAFT, the Customer Service Division of Beech Aircraft Corporation publishes and revises as necessary the operating instructions, shop/maintenance manuals and parts catalogs for all BEECHCRAFT airplanes as well as service bulletins and service letters. *All of these publications are available from your BEECHCRAFT distributor or dealer."* [Emphasis supplied.]

### Sales Policies

Perhaps the widest control exercised by Beech over Hawthorne is in the realm of sales policies. Hawthorne agrees that it will " * * * comply with the policies, directives and requirements contained in the Beechcraft sales policy manual and shall be responsible for developing the sale of Beech products to the fullest extent." These policies may be changed at any time, with such changes binding on Hawthorne immediately and thus in effect giving Beech control over Hawthorne's entire sales operation.

Throughout its territory Hawthorne agrees that it will

"appoint dealers for the sale of new Beechcraft airplanes, parts and accessories in the territory designated herein at such places as * * Beech *may consider essential to the development of such territory.* Such dealers shall be appointed only with the concurrence of Beech."

Beech strictly regulates the terms and conditions of such dealer contracts, even dictating the exact terms of the agreement to be used. While Hawthorne is made responsible to Beech for all acts of a dealer, Beech itself reserves a final decision in all dealer matters.

All sales by Hawthorne outside of its assigned territory and all sales by other distributors in Hawthorne's territory are tightly controlled by Beech. Beech reserves to itself the final allocation of the proceeds of such sales, with specific instructions to Hawthorne that this fact should be concealed from Hawthorne's customers.

Beech holds sales training clinics for Hawthorne personnel in Wichita, Kansas and pays Hawthorne all costs of transporting its personnel to these schools, plus $13.00 per day per man while there, and an additional fee of $100.00 per man per week. Periodically Beech sales personnel visit Hawthorne in Charleston, South Carolina.

### General Organization of Beech

The general organization of Beech is almost sufficient evidence itself that its distributors, like Hawthorne, are in fact an integral and necessary part of the Beech operation and that through Hawthorne Beech is "present" in South Carolina. The map in front of the Sales Policy Manual shows that Beech dis-

tributorships encompass the entire United States. Beech sells its aircraft to these distributors. Without these distributors Beech could do no business. This fact is recognized in its contract with Hawthorne:

"Whereas Beech is engaged in the sale and manufacture of aircraft under the trade name and trade mark of Beechcraft, together with spare parts and accessories used in connection therewith, and distributor desires to purchase at a discount and to *perform distribution and marketing functions necessary for the sale of certain models of Beechcraft airplanes,* together with the spare parts and accessories used in connection therewith * * *. [Emphasis added.]

Equally important is the service function which Hawthorne and the other distributors perform, without which Beech could not operate. Finally, the Beech Aircraft Corporation organizational charts in the Policy Manual show that the entire corporate structure is geared to the various distributorships which are in fact an integral part of the entire Beech operation, and without which the company could not exist.

### I

As the discussion above shows, there is an abundance of evidence reflecting such control by Beech over Hawthorne as to make Beech "present" in South Carolina under the "minimum contacts" standard set out in International Shoe, for that case is the modern beacon used for guidance in ascertaining the demands and bounds of "due process."

The control exercised by Beech over Hawthorne is strikingly similar to that exercised by Ford over its dealers in this State in Thompson v. Ford Motor Co., 200 S.C. 393, 21 S.E.2d 34 and State v. Ford Motor Co., 208 S.C. 379, 38 S.E.2d 242, where the Supreme Court of South Carolina held that when a national manufacturer markets its products through a network of distributors and dealers, holding exclusive territories and franchises, and by contract or policy, retains effective control over the conduct of the dealer's business, the manufacturer is "doing business" in South Carolina within the meaning of §§ 12–722 [3] and 10–424 [4] of the S.C.Code, 1962.

3. Section 12–722 provides: "Effect of failure to file.—Whenever any foreign corporation transacts business in this State without first having complied with the provisions of § 12–721 and pursuant thereto designating a principal place of business or place of location of such corporation in this State at which all legal process may be served, the foreign corporation so transacting business in this State without complying with said section shall be deemed to have designated the Secretary of State as its true and lawful agent upon whom may be served all legal process in any action or proceeding against such foreign corporation growing out of the transaction of any business in this State. Nothing herein shall apply to insurance companies or associations required to pay fees to the Department of Insurance of this State."

[See also footnote 1, supra, with reference to the repeal of this section.]

4. Section 10–424 provides: "Service on foreign corporations generally.—If the suit be against a foreign corporation other than a foreign insurance company the summons and any other legal paper may be served by delivering a copy to any officer, agent or employee of the corporation found at the place within this State designated by the stipulation or declaration filed by the corporation pursuant to § 12–721. But if such foreign corporation transacts business in this State without complying with that section such service may be made by leaving a copy of the paper with a fee of one dollar in the hands of the Secretary of State or in his office, and such service shall be deemed sufficient service and shall have like force and effect in all respects as service upon citizens of this State found within its limits if notice of such service and a copy of the paper served are forthwith sent by registered mail by the plaintiff to the defendant foreign corporation and the defendant's return receipt and the plaintiff's affidavit of compliance therewith are filed in the cause and submitted to the court from which such process or other paper issued. * * *"

As Judge Haynsworth (now Chief Judge) pointed out in Shealy v. Challenger Manufacturing Co., 304 F.2d 102, 106 (4th Cir. 1962), "The result * * * [in Ross v. American Income Life Ins. Co., 232 S.C. 433, 102 S.E.2d 743] and the broad language of the opinion are inconsistent with a notion that South Carolina construes her service of process statutes narrowly and restrictively." He noted as well, quoting from Boney v. Trans-State Dredging Co., 237 S.C. 54, 115 S.E.2d 508, 511, 512, that it is "apparent that South Carolina now resolves the jurisdictional question in the terms employed in the opinion in International Shoe." 304 F.2d at 106, 107.

As the decision in Boney, supra, points out:

"No universal formula has been, or is likely to be, devised for determining what constitutes 'doing business' by a foreign corporation within a state in such sense as to subject it to the jurisdiction of the courts of that state. The question must be resolved upon the facts of the particular case. [Citations omitted.]

"Recent decisions of both federal and state courts have tended to discard older concepts whereby jurisdiction was accorded on the fictional premise of the corporation's implied consent or on the theory that the corporation is 'present' wherever its activities are carried on, and to substitute therefor, as the jurisdictional test, the requirement that the corporation have such contact with the state of the forum 'that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " [Citations omitted.]

Note also the discussion in 11 S.C.Law Quarterly 385, 387 (1959).

Defendant Beech, in its able brief, contends that service of process upon the Secretary of State in accordance with § 12–722 of the S.C.Code was not effective. This Code Section, which is set out in its entirety in footnote 3, supra, provides for service of process upon a foreign corporation which does not file a stipulation as provided by § 12–721, 1962 Code, setting forth principal place of business or location where "legal papers may be served on the corporation by delivery of the same to any officer, agent or employee of the corporation found therein."

Defendant Beech avers that under the language of § 12–721, citing Foster v. Morrison, 226 S.C. 149, 84 S.E.2d 344, that the Legislature has provided a method of instituting such suits against foreign corporations doing business in the State without complying with that Act, only if the cause of action arose in this State. This construction urged by defendant is not in accord with the decisions construing the statutes in question. For example, Lipe v. Carolina C. & O. Ry. Co., 123 S.C. 515, 116 S.E. 101, 103, 104, 30 A.L.R. 248, in construing what is now § 10–214(1), S.C.Code, 1962, indicated that the "power of the state 'to make the jurisdiction over the foreign corporation wide enough to include the adjudication of [a] transitory action not arising in the State' is not open to question." Thus foreign corporations are amenable to suit for causes of action arising outside the State. Defendant Beech says that the language "growing out of the transaction of any business in this State" in § 12–722 [see footnote 3, supra] are words of limitation which, in substance, means that the State, which authorizes such causes of action intended by these "words of limitation," to preclude effective service of process under such circumstances. Such construction is contrary to reason, because the State will not be presumed to grant a right with one hand and deny it with another, particularly when there are no policy or constitutional reasons evident to compel such a construction. It can only be concluded that South Carolina never intended that a foreign corporation with sufficient "nexus" with the State, which refused or failed to comply with the statutory requirements of the State, could not be sued under the same circumstances

where a foreign corporation which did comply with the State law was subject to suit. The fact that plaintiffs are non-residents as well does not prompt a different conclusion. See Markham v. City of Newport News, 292 F.2d 711, 718 [4th Cir. 1961]. Nor does the decision of Gibbes v. Young, 242 S.C. 217, 130 S.E. 2d 484, compel a conclusion contrary to that reached here. Further, the Congress has specifically enunciated the policy this Court shall follow, by indicating that a Federal District Court, in diversity cases, shall be available wherever the foreign corporation is doing business. 28 U.S.C. § 1391(c).[5] Plainly, this indication of the Congressional will was designed to remove any possible advantage a foreign corporation might acquire by failing to observe the requirements of State law, as was done here. L'Heureux v. Central American Airways Flying Service, Inc., 209 F.Supp. 713, 715 (D.Md.1962).

In Foster v. Morrison, supra, upon which defendant Beech relies most heavily, the foreign corporation objecting to the service of process had once complied with the statutes, but had left the State, severed connections, before the institution of suit. The facts in the instant case show that Beech was "present" and "doing business" within the State during all times material. [Of course, "presence" and "doing business" are not the only factors. See Ciprari v. Servicos Aereos Cruzeiro do Sul, S.A., 232 F.Supp. 433, 435, (S.D.N.Y.1964).]

■ Therefore, when a foreign corporation maintains its "presence" in the State jurisdiction, at least up to the time of the institution of suit, without complying with the statutory requirements, it is subject to the same suits and service of process as are domestic corporations and other foreign corporations who have complied with the statutory requirements. This is particularly so when the

maintenance of suit will not do violence to the concept of "fundamental fairness" which has evolved through the cases.

## II

■ Further to be determined is whether or not the service of the summons upon John M. Hawkins, President of Hawthorne, can be sustained on the basis that Hawkins was an "agent" of Beech within the contemplation of §§ 10–421 and 10–423, S.C.Code 1962. These Acts provide as follows:

*Section 10–421*

"If the suit be against a corporation, the summons shall, except as otherwise expressly provided, be served by delivering a copy thereof to the president or other head of the corporation, or to the secretary, cashier or treasurer or any director *or agent* thereof * * *." [Emphasis supplied.]

*Section 10–423*

"Service can be made in respect to a foreign corporation under the provisions of § 10–421 only (a) when it has property within the State, (b) when the cause of action arose therein or (c) when such service shall be made in this State personally upon the president, cashier, treasurer, attorney, secretary *or any other agent* thereof." [Emphasis supplied.]

It can be readily seen that service of process on a foreign corporation can be properly effectuated by service on "any * * * agent thereof." As observed before, the question to be determined is whether or not the control and supervision exercised by Beech over Hawthorne was sufficient to conclude that Hawthorne was Beech's "agent" for service of process.

The question is not easy to resolve at a glance because there is no parent-subsidiary relationship, Cf. Ideal Theater v.

---

5. Title 28 U.S.C. § 1391(c) provides:
"A corporation may be sued in any judicial district in which it is incorporated or licensed to do business or is doing business, and such judicial district shall be regarded as the residence of such corporation for venue purposes."

Southern Enterprises, Inc., 132 S.C. 352, 128 S.E. 166; Darling Stores Corp. v. Young Realty Co., 121 F.2d 112, 116 (8th Cir. 1941), though considerable control is evident.

To arrive at a proper conclusion regarding "agency", the law of South Carolina should be looked to. McNeill v. Electric Storage Battery Co., 109 S.C. 326, 96 S.E. 134, reveals a situation somewhat akin to the instant case insofar as a determination to ascertain if there is sufficient "agency" to permit service of process against a purported principal, a foreign corporation, is concerned. In Mc-Neill the Court said:

> "It will be seen that the appellant had absolute control of the Columbia business. It could fix the price from time to time without any reference to the price paid by its so-called purchaser; the codefendant could sell no other batteries; the purchaser so called must ascertain a repair shop satisfactory to the appellant. It must promote, in every reasonable way, the interest of the appellant within and without its territory. It is true the contract provided that the relation of principal and agent should not exist, but when the provisions of a contract make a contract of agency then it is a contract of agency, and it makes no difference by what names the parties may call themselves. This contract gives the appellant complete control for the sale of its goods, and the business is the business of the appellant."

109 S.C. at 330, 96 S.E. at 135.

In Ideal Theatre v. Southern Enterprises, Inc., 132 S.C. 352, 128 S.E. 166, though there was stock ownership by defendant corporation, the Court still looked to the activities to determine if there was "agency." The Court found that the foreign corporation was doing business in the State, that the manager of the local theatre was its agent, and that service on him was binding on the foreign corporation. Both of these cases were cited and quoted from with approval in Thompson v. Ford Motor Co., 200 S.C. 393, 21 S.E.2d 34, in which it is interesting to note that the Court said:

> "It is true that the power to contract for one's principal is strong evidence of agency, but it is only one means by which agency can be shown, and does not constitute the sole test as to its existence. Agency may be shown by the fact that a person represents his principal in some one or more of his relations to others, even though he lacks contractual power. This Court has said * * * that: '* * * The statute makes service on "any agent" of a foreign corporation sufficient. The statute, therefore, does not require that the agent shall be general, but is complied with by a service upon an agent having limited authority to represent his principal.' "

200 S.C. at 430, 21 S.E.2d at 49, 50.

Though McSwain v. Adams Grain & Provision Co., 93 S.C. 103, 76 S.E. 117, 121, is distinguishable from the instant case on the facts, the principles applied were the same as mentioned above. In Calhoun Mills v. Black Diamond Collieries, 112 S.C. 332, 99 S.E. 821, the Court there lights a path almost directly to the set of facts existing here when it held that an agent of a domestic corporation could be properly served to effectuate service on a foreign corporation when the domestic corporation was the selling agent for the foreign corporation.—Note that in the instant case, Hawthorne is the "selling agent" for Beech, though agency as such is disclaimed. Of course, disclaimers or even silence is not controlling. The important consideration is the acts or activities of the parties. McNeill v. Elec. Storage Battery Co., supra; Gillespie v. Ford, 225 S.C. 104, 81 S.E.2d 44, 49. See also Tate v. Claussen-Lawrence Const. Co., 168 S.C. 481, 167 S.E. 826, 829, where the court observed, in a context different than the instant matter, "that mere declaration does not make the contract something other than agency if a proper construction of its terms shows that the relation is one in fact of principal and agent."

As Judge Brown, observed in Delray Beach Aviation Corp. v. Mooney Aircraft, Inc., 332 F.2d 135 (5th Cir. 1964):

"Mooney Aircraft, engaged in the manufacture of airplanes in Texas, but aware that its commercial success depended on the intensive sale of its airplanes throughout the nation, purposefully sought to enter and compete in the Florida market. With a choice of doing it by direct employees in a company branch, or through a traditional sales and service distributor, it deliberately chose the latter. * * * Through this medium it was doing substantially everything which a branch could have done. Florida, as a matter of deliberate policy * * * sees no distinction between the two. Nor, through constitutional eyes, must there be any distinction where in fact the contacts are sufficient, as they are here. * * *"

332 F.2d at 141.

"The inescapable fact which courts ought to be able to recognize is that Mooney Aircraft and Metropolitan had, to a great extent, a mutual interest in the sale, service, and distribution of Mooney Airplanes. Paraphrasing a celebrated apothegm, what was good for Metropolitan was good for Mooney Aircraft, and vice versa.

\* \* \* \* \* \*

"It would be difficult to conceive of a relationship imposing a greater duty, either legal or moral, on the part of Metropolitan to forward a court summons to Mooney Aircraft. The claim arose out of the failure of a Mooney airplane in flight. The business reputation, prestige and future sales of both Mooney Aircraft and its distributor, Metropolitan, made it important that this litigation be properly handled. With so much at stake for each in the future sales of Mooney airplanes in that wide area, there was every reason to suppose that Metropolitan would do exactly as it did—transmit the process immediately. Within the broad qualitative–quantitative standards imposed by the distributor sales and service agreement, Metropolitan would be aware that failure to give notice to Mooney Aircraft in time for it reasonably to protect its interests would subject the distributor to the likely cancellation of the contract and the termination of what must have been deemed to be a profitable business connection. As we said in Acme Eng'r, Inc. [Acme Eng'r, Inc. v. Foster Eng'r Co., 5 Cir., 254 F.2d 259] of a Texas 'traveling salesman,' Metropolitan here 'occupies such a responsible representative status as to make it reasonably certain that [it] will turn over the process to his company.' And there, as here, the fact that the representative 'actually passed [the process] on' may be considered in determining that reasonable probability. 254 F.2d 259, 263. It is this strong compulsion, whether described as a moral or a legal duty, to transmit the process on to the nonresident which supplies what was held to be the missing compunction in Wuchter v. Pizzutti, 1928, 276 U.S. 13, 48 S.Ct. 259, 72 L.Ed. 446."

332 F.2d at 143.

This case from the Fifth Circuit Court of Appeals and the instant matter under consideration are strikingly similar factually, and the comments there seem equally apropos here.

In Kahn v. Maico Co., 216 F.2d 233 (4th Cir. 1954) another substantially similar set of facts arose in Maryland. A domesticated partnership had an exclusive franchise from a foreign manufacturer who had not "qualified" within the State. The contract contained restrictions and controls on the local distributor much like those present here. Like Hawthorne, the local distributor bought the foreign corporation's products at a discount; received no sales commis-

sion. In confirming jurisdiction, Chief Judge Parker said:

> "[T]here can be no doubt but that defendant actually participated in the sales made by plaintiffs, since the guaranty given in connection with the sale of a hearing aid was a part of the sale, and in making the guaranty the plaintiffs were unquestionably acting as agents of defendants.[6] * * *
>
> "On these facts, we think that defendant was clearly doing business in the state within the meaning of the statute. In La Porte Heinekamp Motor Co. v. Ford Motor Co., D.C., 24 F.2d 861, and the very recent case of Thomas v. Hudson Sales Corp., [204 Md. 450] 105 A.2d 225, 228, in both of which jurisdiction was sustained, it was pointed out that, while it did not constitute doing business within the state for a foreign corporation to make sales outside the state to distributors who carried on business therein, even though a district superintendent might visit them and advise with respect to selling policies, nevertheless such foreign corporation would be held to be doing business within the state if it went beyond this pattern and exercised substantial control over the business of the local distributor. Here the defendant not only controlled the business policies of the distributor, but also regulated the details of the business almost as completely as if the distributor had been an agent in all respects. No one would contend that what was done did not constitute doing business by defendant if plaintiffs had been compensated on a commission basis instead of by discounts allowed from the sale price which defendant fixed; but the method of compensating the one who carries on the business cannot defeat jurisdiction when it appears that it was in reality defendant's business that was being carried on."

216 F.2d at 235.

Beech, acknowledging the relevance and applicability of International Shoe Co. v. State of Washington, 326 U.S. 317, 66 S.Ct. 154, points out that "not a single one of these facts is present in our case." Perhaps the appropriate answer to this can be found in the dissent of Judge Fahy in Jackson v. United States, 337 F.2d 136, (D.C.1964):

> "No two cases are alike. The value of constitutional precedents is not merely to guide to a decision on like facts. Their value is also in the exposition of legal principles to be applied to facts which, though different, rationally call for application of the principles which have been exposited. The exclusionary rules are not prisoners of the particular factual situations where the rules have been applied." 337 F.2d at 144.

One cannot help but observe that there are numerous "progeny" of International Shoe which are remarkably similar to the instant case on the facts and on what this court suggests is the applicable law.

It goes without saying that each case must be decided on its own particular facts, and that the courts have tended to discard the older concepts of jurisdiction, poignantly characterized in Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565, whereby jurisdiction was accorded on the premises of "implied consent" or on the basis that the corporation was "present" wherever its activities are carried on; instead the test for jurisdiction is whether or not the subjection to suit would offend traditional notions of fair play and substantial justice. Boney v. Trans-State Dredging Co., 237 S.C. 54, 115 S.E. 2d 508, 511, 512; Shealy v. Challenger Mfg. Co., 304 F.2d 102, 104 (4th Cir. 1962). Other considerations include a sensible application of the doctrine *forum non conveniens* and the corporation's "nexus" with the State.

---

6. Notice the applicability of this language to the warranty given with the sale of the aircraft in the instant case.

Thus, in a very real sense, the recitation of facts and the discussion following, in which it was concluded that Beech was "present" and "transacting business" in South Carolina, went a bit beyond what was necessary to be shown to hold Beech amenable to suit in this State. Because, as was noted in the paragraph above, the doctrine enunciated has given away somewhat to an asking of whether or not the foreign corporation had such a "nexus" with the State that fair play and substantial justice would not be violated, taking into account the salutory doctrine of *forum non conveniens,* if the foreign corporation was held amenable to suit within the State.

Beech's motion to quash service of process must be denied. The jurisdiction of this Court over Beech does not violate any of the "fairness" concepts of due process. The Beechcraft airplane involved was last serviced in South Carolina and one of the defendants is amenable to service only in this State. Moreover, Beech has undertaken the manufacture and sale of airplanes on a nationwide basis which product, because of its nature, requires extensive and frequent servicing throughout the country. To insure the success of this servicing Beech controls and supervises this essential function (for which the public has every right to be grateful) through its network of distributors and dealers. Therefore, it is proper that Beech be held amenable to suit where this essential activity is performed by one of its distributors whom it so closely controls and with whom it is so intimately involved.

Motion denied.

In accordance with 28 U.S.C. § 1292 (b), the Court hereby certifies that it is of the opinion that the within order involves controlling questions of law as to which there are substantial grounds for difference of opinion and that an immediate appeal from the within interlocutory order of the Court may materially advance the ultimate termination of the litigation; and that either party should have the opportunity to apply to the Court of Appeals for the Fourth Circuit for permission for an appeal to be taken from such order if either should so desire. Should such application for an appeal be made by either party and such permission be granted by the Court of Appeals, then further proceedings in this case shall be stayed until a determination of the appeal.

And it is so ordered.