Larry Esco MIDDLEBROOKS, Plaintiff,
v.
The CURTIS PUBLISHING COMPANY,
Defendant.

Civ. A. No. 8368.

United States District Court
D. South Carolina,
Florence Division.

Feb. 22, 1967.

James P. Mozingo, III, D. Kenneth Baker, Darlington, S. C., Thomas E. Smith, Jr., Pamplico, S. C., Kenneth L. Holland, Camden, S. C., for plaintiff.

Carlisle Roberts, Roberts, Jennings & Thomas, Columbia, S. C., for defendant.

## ORDER

SIMONS, District Judge.

This is an action for libel brought by plaintiff, Larry Esco Middlebrooks, against defendant, The Curtis Publishing Company, the publisher of the Saturday Evening Post. Plaintiff alleges that a short story entitled "MOONSHINE LIGHT, MOONSHINE BRIGHT" by William Price Fox, published in the March 16, 1963 edition of the Saturday Evening Post libeled him. Suit was originally instituted in the Court of Common Pleas for Darlington County, South Carolina. Plaintiff served the summons and complaint upon Curtis Publishing Company by service upon the Secretary of State of South Carolina pursuant to Section 10–424 [1] and Section 12–23.14 [2] of the 1962 South Carolina Code of Laws, as amended. Such substituted service is provided for under Rule 4(d) (7) of the Federal Rules of Civil Procedure.

Defendant appeared specially moving to quash the service of process upon it, to dismiss the complaint upon the ground that the service of process was insufficient, and that the court therefore lacks jurisdiction over it.

Oral arguments by counsel for the parties were heard in Florence, South Carolina and written briefs were thereafter submitted. The sole question before the court for purposes of the motion is whether defendant is now, or at the time of the alleged wrong upon which plaintiff's claim for relief is based was, "doing business" in South Carolina so as to validate the substituted service of process made pursuant to State statutory provisions. The service is valid if the court determines that defendant has the requisite "minimum contacts" with the State of South Carolina. International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). There is no set formula by which "minimum contacts" may be weighed. Each case must be considered and judged upon

[1]. Section 10–424 provides in part:
"If the suit be against a foreign corporation other than a foreign insurance company the summons and any other legal paper may be served by delivering a copy to any officer, agent or employee of the corporation found at the place within this State designated by the stipulation or declaration filed by the corporation pursuant to § 12–721. But if such foreign corporation transacts business in this State without complying with that section such service may be made by leaving a copy of the paper with a fee of one dollar in the hands of the Secretary of State or in his office, and such service shall be deemed sufficient service and shall have like force and effect in all respects as service upon citizens of this State found within its limits if notice of such service and a copy of the paper served are forthwith sent by registered mail by the plaintiff to the defendant foreign corporation and the defendant's return receipt and the plaintiff's affidavit of compliance therewith are filed in the cause and submitted to the court from which such process or other paper issued.
"Such service may also be made by delivery of a copy thereof to any such corporation outside the State, and proof of such delivery may be made by the af-fidavit of the person delivering such copy. Such affidavit shall be filed in the cause and submitted to the court from which the process or other paper issued."

[2]. Section 12–23.14 provides in part:
"(a) Every foreign corporation which is not authorized to do business in this State shall, by doing in this State, either itself or through an agent, any business, including any business for which authority need not be obtained as provided by § 12–23.1, be deemed to have designated the Secretary of State as its agent upon whom process against it may be served in any action or proceeding arising out of or in connection with the doing of any business in this State.
"(b) Service of such process shall be made by delivering to and leaving with the Secretary of State, or with any person designated by him to receive such service, duplicate copies of such process, notice, or demand. The Secretary of State shall thereupon immediately cause one of such copies to be forwarded by registered mail, addressed to the corporation, either at its registered office in the jurisdiction of its incorporation, its principal place of business in such jurisdiction, or at the last address of such foreign corporation known to the plaintiff, in that order."

its own particular facts, and the material factor is the quality and nature of the corporation's activity rather than quantity. Shealy v. Challenger Mfg. Co., 304 F.2d 102, 104 (4th Cir. 1962); Carolina Boat & Plastics Co. v. Glascoat Distributors, Inc., 152 S.E.2d 352 (S.C. 1967); Boney v. Trans-state Dredging Co., 237 S.C. 54, 115 S.E.2d 508 (1960). In this diversity action the court is bound by South Carolina's interpretation of its service of process statutes.

Defendant is a Pennsylvania corporation with its registered office and principal place of business in Philadelphia, Pennsylvania. It is the publisher of the Saturday Evening Post, and it is also its own printer with its manufacturing plant in Sharon Hill, Pennsylvania. Defendant's counsel also advised the court that defendant is registered and admittedly doing business in twelve states other than South Carolina. The nearest to South Carolina is the State of Georgia. Defendant publishes five magazines other than the *Saturday Evening Post*, including the *Ladies Home Journal, Holiday, The American Home* and *Jack and Jill*. All five of these publications are circulated in this State. In the first half of 1960 defendant sold an average of 107,-968 magazines per month in South Carolina, not including the circulation of *Jack and Jill*. For the second half of 1960 it sold 112,365 magazines per month. From January through June of 1963 the average circulation per month was 133,-353 magazines. South Carolina distributors received 52,528 copies of the March 16, 1963 issue of the *Saturday Evening Post* carrying the article in which plaintiff claims he was libeled. No figures were obtained that would show the subscription circulation in South Carolina for this March 16, 1963 issue. Defendant's total distribution was 7,012,944 copies. In 1960, defendant realized $82,-714.91 from advertising originating in South Carolina; in 1961, $28,605.79; in 1962, $14,398.28; in 1963, $10,012.15; and in 1964, $21,514.55. It maintains an office in Atlanta, Georgia and from this office three different persons, residents of Georgia, regularly solicit advertising for the *Saturday Evening Post, Holiday, The Ladies Home Journal* and *The American Home* magazines in this State. Each of these three men travels to and enters South Carolina approximately once every three months. Such trips last anywhere from one-half to two and one-half days.

Curtis Publishing Company itself does not distribute, circulate, sell or solicit subscriptions for magazines published by it. Its wholly owned subsidiary, Curtis Circulating Company, is exclusively responsible for distribution and sale of its publications. The distribution agreement between it and Curtis Circulation Company provides that:

"(1) Curtis Circulation Company shall have the exclusive right throughout the world to solicit and make subscription sales and single (newsstand) copy sales of defendant's magazines.

"(2) Subscription sales shall be made to the public only at the rates therefor established from time to time by defendant, which rates may be changed by agreement between Curtis Circulation Company and defendant. All subscription orders obtained by Curtis Circulation Company shall contain a provision that a proportionate refund of the subscription price will be made to any subscriber who cancels his subscription prior to the expiration date thereof. Curtis Circulation Company shall pay over to defendant monthly the full subscription price for all subscription sales made during the month. Defendant shall pay to Curtis Circulation Company monthly the prescribed commission on all paid subscription orders. All subscription orders shall become the property of defendant, shall be turned over to defendant as promptly as possible after receipt and shall

be faithfully fulfilled by defendant.[3]

"(3) Curtis Circulation Company shall furnish defendant with an estimate of its single (newsstand) copy requirements for each issue of each of defendant's magazines at least thirty days prior to the scheduled released date. Defendant shall furnish to Curtis Circulation Company all of Curtis Circulation Company's single (newsstand) copy requirements at prices prescribed by defendant. Defendant shall deliver and sell its magazines to Curtis Circulation Company, F.O.B. such delivery points and in such quantities as Curtis Circulation Company shall designate in writing, at the prices prescribed in the agreement. Curtis Circulation Company shall receive credit for unsold copies provided it submits satisfactory proof of the non-sale thereof within sixty days after the close of the month in which such copies were delivered and sold to it.

"(4) Defendant shall reimburse Curtis Circulation Company for those reasonable and proper expenses incurred by it in the promotion, sale and distribution of the magazines as are usual and normal in the trade.

"(5) Curtis Circulation Company shall at all times provide an adequate organization and means for the promotion, sale and distribution of defendant's magazines and shall use its best efforts to maintain and increase the circulation thereof."

Curtis Circulation Company purchases defendant's publications at the latter's Sharon Hills Manufacturing plant, at that time taking title to and possession of the publications. From Sharon Hills, Curtis Circulation Company then ships the magazines by rail and truck into South Carolina to local wholesalers who take title upon delivery to their places of business.[4] The South Carolina Wholesalers distribute the publications to local retailers. Curtis Circulation Company has agreements with the following wholesale distributors in South Carolina:

E. A. Price & Son
1312 River Street
Anderson, South Carolina

Charleston News Company
224 Huger Street
Charleston, South Carolina

Central News Company
920 Hemlock Drive
Columbia, South Carolina

Pee Dee News Company
160 N. Edisto Drive
Florence, South Carolina

Palmetto News Company
307 Fall Street
Greenville, South Carolina

City News Agency
Union Road
Spartanburg, South Carolina

Sam A. Kerhalas
31 Main Street
Union, South Carolina

The substance of the agreement between Curtis Circulation Company and these wholesalers is as follows:

"(1) Curtis Circulation Company agrees to sell to the named wholesaler magazines published by various publishers at the prices set forth in Schedule B attached to the agreement. Curtis Circulation Company agrees to ship the various magazines to the wholesaler's place of business, transportation charges prepaid, by mail, express or freight at times designated to assure delivery to the wholesaler at least one day

---

3. Subscriptions are also solicited by Keystone Readers' Service, Inc., another wholly owned subsidiary. A corporation existing under the laws of Pennsylvania, it is not registered to do business in South Carolina.

4. Subscription sales are mailed to South Carolina subscribers from Philadelphia. Although Curtis Circulation Company solicits these subscriptions, it is the contractual obligation of defendant to fulfill the subscriptions.

prior to the authorized sales dates thereof.

"(2) Wholesaler agrees to pay Curtis Circulation Company for all copies of magazines delivered to the wholesalers at the respective per copy price specified in schedule B attached to the agreement less credit for unsold copies of magazines returned to Curtis Circulation Company. To receive the credit for unsold copies, the wholesaler must return to Curtis Circulation Company within 45 days of their respective off-sale dates either the complete front cover or title heading of each unsold copy. Wholesaler is to destroy or mutilate to the extent that they can only be resold as waste paper all copies of magazines, the front covers or title headings of which are returned to Curtis Circulation Company for credit as unsold copies.

"(3) Wholesaler agrees to use its best efforts to promote the sale of the magazines listed in schedule B attached to the agreements. The wholesaler is not to display or sell, or authorize any retail dealer to display or sell, any issues of the magazines listed in schedule B prior to the respective authorized sales dates thereof specified by Curtis Circulation Company. The wholesaler is to make initial distribution of copies of each issue of such magazines to retail dealers in the morning of the respective authorized sales dates thereof and such additional deliveries in accordance with the needs of the retail dealers."

Each individual retailer may set his own price for defendant's publications, but each issue contains a suggested retail price.

Defendant maintains that it has no general supervisory powers over the activities of Curtis Circulation Company; that is, all management and operation decisions of Curtis Circulation Company are made by its own board of directors. Defendant further maintains that Curtis Circulation Company is an autonomous subsidiary; and is also engaged in the business of soliciting subscriptions, distributing or selling magazines published by other publishers. It distributes and sells magazines published by Esquire, Inc., Cowles Magazines and Broadcasting, Inc., Newsweek, Inc., Street and Smith Publications, Inc., New York Magazines, Inc., The Atlantic Monthly Company and Harper and Brothers.

Curtis Circulation Company has no telephone listing in South Carolina, nor does it maintain any storage facility in the state. Nevertheless, it has a representative who is a resident of Orangeburg, South Carolina. This person handles arrangements for student solicitation of orders for subscriptions to magazines published by defendant and by other publishers at schools participating in the Curtis Circulation Company School Plan. This representative handles such arrangements in approximately 125 participating North and South Carolina schools per year.

In regard to the facts defendant takes three positions: (1) it was not "doing business" in South Carolina within the meaning of the substituted service statute; (2) this action did not arise "out of or in connection with" its doing of any business in South Carolina within the meaning of the substituted service statute; and (3) the exercise of jurisdiction over it by the court of South Carolina is inconsistent with the requirements of due process.

Chief Judge Haynsworth's landmark decision in Shealy v. Challenger Mfg. Co., supra, analyzes and summarizes South Carolina's interpretations of its service of process statutes; he concluded that South Carolina has given a broad construction to her service of process statutes when the question arises relative to the jurisdiction of its courts. He concluded that in the interpretation and application of its service of process statutes the South Carolina Court approaches the ultimate constitutional bounds, as limited

only by the Fourteenth Amendment to the Constitution. See Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). The South Carolina Supreme Court has made it clear that the term "doing business" is one that it has in more recent decisions equated with such minimal contacts with the state that the maintenance of a suit does not "offend traditional notions of fair play and substantial justice," and that whatever limitation it imposes is equivalent to that of the due process clause of the Fourteenth Amendment. Carolina Boat & Plastics Co. v. Glascoat Distributors, Inc., 152 S.E.2d 352 (S.C.1967); Boney v. Trans-state Dredging Co., 237 S.C. 54, 115 S.E.2d 508 (1960); Ross v. American Income Life Ins. Co., 232 S.C. 433, 102 S.E.2d 743 (1958); Thompson v. Ford Motor Co., 200 S.C. 393, 21 S.E.2d 34 (1942); Shealy v. Challenger Mfg. Co., 304 F.2d 102 (4th Cir. 1962); Szantay v. Beech Aircraft, 237 F.Supp. 393 (D.S.C.1965), aff'd. 349 F.2d 60 (4th Cir. 1965).

The Fourth Circuit Court of Appeals has not recently had occasion to address itself to this precise factual question. Nevertheless, two circuit courts have, and they have most authoritatively explored the question of "minimum contacts" and due process. The Tenth Circuit in Curtis Pub. Co. v. Cassel, 302 F.2d 132 (10th Cir. 1962), in a factual situation upon all fours with the present action, held the distributor of defendant publisher's magazines to be defendant's agent. When the distributor's contacts were weighed, the Tenth Circuit considered them well above the minimum necessary to constitute doing business. Indeed, during oral argument of the present action, defendant's counsel admitted " * * * there is no question that they [Curtis Circulation Company] do business in South Carolina." The Tenth Circuit in summary of the distributor's activities stated:

"We are not impressed by the argument that the Curtis-Distributor contract was one of sale and purchase rather than one of agency. Subscription payments are remitted to Curtis which pays Distributor a commission thereon. While Distributor purchases newsstand copies at an agreed price for delivery at the point designated by it, Distributor receives credit from Curtis for unsold copies. Distributor is required to use its best efforts to promote Curtis publications and for so doing it is reimbursed by Curtis. Thus, the risk of success or failure in publication is taken by Curtis. In our opinion Distributor was the agent of Curtis." 302 F.2d at 137, 138.

Defendant in this action argues that its contacts with the distributor cannot constitute an agency relationship, since there is a factual distinction from the defendant-distributor relationship here and such relationship in *Cassel*. Be that as it may, *Cassel* in the true analysis simply marks a beginning by the courts to look beyond corporate pyramiding to the true nature and quality of the parent publishing company's activities.

As Judge Soboleoff pointed out in Szantay v. Beech Aircraft Corp., 349 F.2d 60 (1965), extensive controls over a local dealer by a major corporation constitute sufficient contacts by the corporation with the state sufficient to make that dealer the agent of the corporation and to give the corporation the requisite "minimum contacts" with the forum state so that effective service of process may be made upon it in accordance with the state's long-arm statutes. Do not the same principles apply here? Defendant, on the other hand, asserts that older decisions such as Street & Smith Pub. Co. v. Spikes, 120 F.2d 895 (5th Cir. 1941), are controlling in this situation. As Judge Riner pointed out in Curtis Pub. Co. v. Birdsong, 360 F.2d 344, 348 (5th Cir. 1966) (concurring specially), much water has flowed under the bridge since these decisions, and the *Street* case was decided before liberalization of the use of the Texas long-arm statute. He doubts now whether *Street* is good law. The same might be said of Cannon v. Time, Inc., 115 F.2d 423 (4th Cir. 1940), yet, even so, that decision is not factually apropos to the present case.

The latest opinion in this area is Curtis Pub. Co. v. Birdsong, supra.[5] There the court denied *in personam* jurisdiction and ordered that the attempted service of process be quashed. That action was brought in the District Court for the Northern District of Alabama by Colonel Birdsong, Commander of the Mississippi Highway Patrol, as a class action on behalf of himself and other members of the Mississippi Patrol for an alleged libel published in the Saturday Evening Post. The accused article was researched in Mississippi and written in New York. The article made no mention of Alabama citizens or residents and described events that took place entirely outside Alabama's boundaries. Indeed, the denial of jurisdiction was decided solely on Alabama's lack of sufficient interest in the litigation to justify its exercise of extra-territorial jurisdiction. The Fifth Circuit said:

> "There must be a rational nexus between the fundamental events giving rise to the cause of action and the forum State which gives that State sufficient interest in the litigation before it may constitutionally compel litigants to defend in a foreign forum. This seems to be what the Supreme Court meant when it spoke of the 'relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure.' International Shoe Co. v. State of Washington, 1945, 326 U.S. 310, 319, 66 S.Ct. 154, 160, 90 L.Ed. 95."

■ The interest of the state of South Carolina in this litigation is unmistakable. Plaintiff is a citizen of South Carolina, a resident of Florence County. Defendant's published article involved alleged illegal operations and activities in South Carolina participated in by one "Esco Brooks," who allegedly is readily identifiable and actually has been identified by the public as plaintiff, Esco Middlebrooks. Plaintiff further alleges that this libel was published throughout the cities of Columbia, Florence, Darlington, Hartsville and Bennettsville, South Carolina, in which areas plaintiff is well known and respected.

Since the State and some of its citizens have a definite interest in the litigation and it will be far more convenient for plaintiff to litigate here than in Pennsylvania, or some other state in which defendant is licensed to do business, I have no difficulty in finding that defendant, by the soliciting of subscriptions, advertisements and through the circulation of its magazines in South Carolina, has purposefully availed itself of the privilege of conducting activities within the forum State, and has engaged the benefits and protections of its laws. I therefore conclude that its activities in South Carolina are entirely sufficient under the Due Process Clause of the Fourteenth Amendment to establish the necessary minimum contacts, ties and relationship with this State to warrant the exercise of extraterritorial jurisdiction.

■ Defendant's contention that the cause of action must have arisen out of, or in connection with, the doing of business in South Carolina is also satisfied by the facts of this case. As the Tenth Circuit held in *Cassel*, supra:

> "The cause of action asserted here arose while Curtis was doing business in that state. There was communication of the claimed libelous material to people in Kansas. No good purpose is served by speculation as to whether Kansas will follow the multi-publication or the single-publication rule in libel cases. As yet there is no Kansas decision on the subject. We have here no statute of limitations question and no other action pending. Whatever choice of laws or conflict of laws questions may arise in the trial, they are not now before us. Libel is a transitory rather than a local action. Each distribution of a libelous article is a tort. The problems discussed in Dale System, Inc. v. Time, Inc., D.Conn., 116 F.Supp.

5. Compare New York Times Co. v. Connor, 365 F.2d 567 (5 Cir., 1966), and note the dissent of Judge Lynne at p. 580.

527, are not presented. It is enough that the cause of action arose while Curtis was doing business in Kansas."

The South Carolina Supreme Court has not had occasion to determine whether it will follow the multi-publication rule, or the single-publication rule in a libel action. Upon the facts here presented, the court holds that it is sufficient that the cause of action arose while defendant was doing business in South Carolina. Therefore, it is concluded that defendant was "doing business" in this State at the time of the publication of the alleged libel, and that it had the requisite minimum contacts to validate the substituted service of process upon it pursuant to Sections 10–424 and 12–23.14, supra. This court will retain jurisdiction of this cause. It is, therefore,

Ordered that defendant's motion to quash service of process upon it, and to dismiss this action for lack of jurisdiction be, and it hereby is, denied.

And it is so ordered.